NO. 24-1620

# United States Court of Appeals for the First Circuit

VICOR CORPORATION,

Plaintiff-Appellee,

v.

FII USA INC., FOXCONN INDUSTRIAL INTERNET USA INC., INGRASYS TECHNOLOGY INC.; INGRASYS TECHNOLOGY USA INC.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:24-cv-10060-LTS

Hon. Leo T. Sorokin

**BRIEF OF PLAINTIFF-APPELLEE VICOR CORPORATION**

Lawrence K. Kolodney
Steven R. Katz
Elizabeth G. H. Ranks
Fish & Richardson P.C.
One Marina Park Drive
Boston, MA  02210
617-542-5070
kolodney@fr.com

Counsel for Plaintiff-Appellee
VICOR CORPORATION

## PLAINTIFF-APPELLEE VICOR CORPORATION'S
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Plaintiff-Appellee Vicor Corporation hereby states that Vicor Corporation has no parent corporation and there is no publicly held corporation that owns more than 10% of Vicor stock.


Dated:  September 30, 2024          */s/ Lawrence K. Kolodney*
                                     Lawrence K. Kolodney
                                     Fish & Richardson P.C.
                                     One Marina Park Drive
                                     Boston, MA  02210
                                     617-542-5070
                                     kolodney@fr.com

                                     Counsel for Plaintiff-Appellee
                                     VICOR CORPORATION

i

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ISSUES ON APPEAL..........................................................................................4

STATEMENT OF THE CASE.............................................................................5

  A. Facts of the Case.........................................................................................5

    1. Vicor's Policies Concerning POs .................................................5

    2. Vicor's Years-Long Course of Dealing with Foxconn ................8

    3. Foxconn's Disavowal of Any Binding Obligation from its POs...9

    4. Vicor's Handling of the Foxconn POs at Issue .........................10

  B. Procedural History....................................................................................15

STANDARD OF REVIEW ...............................................................................19

SUMMARY OF ARGUMENT..........................................................................20

ARGUMENT .....................................................................................................23

  A. The District Court Did Not Abuse Its Discretion in Issuing the Injunction...23

    1. The District Court Correctly Concluded that Vicor Was Likely to Succeed on the Merits .................................................................23

    2. The District Court's Finding of Irreparable Harm was Not Clearly Erroneous .................................................................................37

    3. The Balance of Equities Favors an Injunction ..........................40

    4. The Public Interest Favors an Injunction ..................................41

  B. The District Court Correctly Concluded that Section 1659 Posed No Bar to Enjoining an Improper Arbitration .......................................................41

    1. Even if Section 1659 applied to this case (it does not), the statute only requires a stay, and not vacatur—the injunction would remain in effect during the stay .................................................................41

    2. Section 1659 only applies to parallel infringement actions—not to an action seeking to enjoin an improper arbitration...............44

    3. Even if applicable, Section 1659 did not prevent issuance of the preliminary injunction ..............................................................49

C.  Comity Is Not Implicated by the Preliminary Injunction ............................. 51

CONCLUSION ......................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Athina Investments Ltd. v. Pinchuk*,
    443 F.Supp.2d 177 (D. Mass. 2006)....................................................53

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002)...........................................................................44

*Bourque v. F.D.I.C.*,
    42 F.3d 704 (1st Cir. 1994).................................................................24

*Broadcom Corp. v. Qualcomm Inc.*,
    No. 05-cv-468, 2005 WL 5925585 (C.D. Cal. Sept. 26, 2005)...........50

*City of Meridian v. Algernon Blair, Inc.*,
    721 F.2d 525 (5th Cir. 1983) ..............................................................40

*Com. & Indus. Ins. Co. v. Bayer Corp*,
    433 Mass. 388 (2001) ...........................................................................6

*Cortez Byrd Chips, Inc. v. Bill Harbert Construction Co.*,
    529 U.S. 193 (2000)............................................................................51

*Crellin Techs., Inc. v. Equipmentlease Corp.*,
    18 F.3d 1 (1st Cir. 1994).....................................................................25

*In re Criminal Complaint*,
    329 F.3d 131 (2d Cir. 2003) ...............................................................42

*Extrusion Painting v. Awnings Unlimited*,
    37 F.Supp.2d 985 (E.D. Mich. 1999) ..................................................32

*F.D.I.C. v. Kooyomjian*,
    220 F.3d 10 (1st Cir. 2000)..................................................................19

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)............................................................................46

*Fuji Photo Film Co., Ltd. v. Benun*,
    463 F.3d 1252 (Fed. Cir. 2006) .....................................................49, 53

*General Elec. Co. v. Deutz AG*,
270 F.3d 144 (3rd Cir. 2001) ................................................................53

*Gill v. Richmond Co-op. Ass'n*,
309 Mass. 73, 34 N.E.2d 509 (1941) ..............................................25, 26

*Golan v. Holder*,
565 U.S. 302 (2012).............................................................................46

*Greene v. Ablon*,
794 F.3d 133 (1st Cir. 2015).................................................................33

*H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*,
694 F.3d 827 (7th Cir. 2012) ...............................................................42

*HealthproMed Found., Inc. v. Dep't of Health & Hum. Servs.*,
982 F.3d 15 (1st Cir. 2020)...................................................................43

*Hiller Cranberry Prods. v. Koplovsky*¸165
F.3d 1 (1st Cir. 1999).........................................................................19

*Inception Mining, Inc. v. Danzig, Ltd.*,
312 F.Supp.3d 1271 (D. Utah 2018).....................................................39

*Johnston v. Holiday Inns, Inc.*,
595 F.2d 890 (1st Cir. 1979).................................................................27

*JSW Steel USA Ohio, Inc. v. Marubeni-Itochu Steel Am., Inc.*,
573 F.Supp.3d 1212 (S.D. Ohio 2021) *vacated on other grounds*,
No. 20-cv-03415, 2022 WL 18572393 (S.D. Ohio April 14, 2022) .................35

*King v. Burwell*,
576 U.S. 473 (2015)......................................................................45, 46

*Levine v. Comcoa Ltd.*,
70 F.3d 1191 (11th Cir. 1995) ..............................................................42

*March v. Mills*,
867 F.3d 46 (1st Cir. 2017)...................................................................20

*Maroc Fruit Board S.A. v. M/V ALMEDA STAR*,
961 F.Supp.2d 362 (D. Mass. 2013)................................................52, 53

*Maurice Electrical Supply Co., Inc. v. Anderson Safeway Guard Rail Corp.*,
632 F.Supp. 1082 (D.D.C. 1986)....................................................31, 34

*McLaughlin Gormley King Co. v. Terminix Int'l Co., L.P.*,
105 F.3d 1192 (8th Cir. 1997) ...............................................38

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*,
337 F.3d 125 (2d Cir. 2003) ...................................................38

*Microsoft Corp. v. Tivo, Inc.,* No.
No. 11-cv-00134, 2011 WL 1930640 (W.D. Wash. May 19, 2011)..................50

*Miller v. French*,
530 U.S. 327 (2000)...............................................................49

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)..........................................................53, 54

*Morgan Keegan & Co. v. Louise Silverman Tr.*,
No. 11-cv-02533, 2012 WL 113400 (D. Md. Jan. 12, 2012), *aff'd sub nom.* 706 F.3d 562 (4th Cir. 2013)..............................................38, 41

*Neuhoff v. Marvin Lumber and Cedar Co.*,
370 F.3d 197 (1st Cir. 2004)................................................25

*New Balance Athletic Shoe, Inc. v. Converse, Inc.*,
86 F.Supp.3d 35 (D. Mass. 2015)........................................45

*OfficeMax, Inc. v. Levesque*,
658 F.3d 94 (1st Cir. 2011)..................................................19

*Ouadani v. TF Final Mile LLC*,
876 F.3d 31 (1st Cir. 2017)..................................................41

*PaineWebber Inc. v. Hartmann*,
921 F.2d 507 (3d Cir. 1990) *overruled on other grounds by Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002) ............................38

*Parex Bank v. Russian Sav. Bank*,
116 F.Supp.2d 415 (S.D.N.Y. 2000) .....................................53

*Pension Plan for Pension Tr. Fund for Operating Engineers v. Weldway Const., Inc.*,
920 F.Supp.2d 1034 (N.D. Cal. 2013) ................................................ 38

*In re Princo Corp*,
478 F.3d 1345 (Fed. Cir. 2007) ......................................... 46, 48, 50

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*,
361 F.3d 11 (1st Cir. 2004) .................................................. *passim*

*Sandisk Corp. v. Phison Elecs. Corp.*,
538 F.Supp.2d 1060 (W.D. Wis. 2008) ............................................ 48

*SEC v. Liberty*,
No. 18-cv-00139, 2020 WL 4677292 (D. Me. Aug. 12, 2020) ...................... 43

*Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*,
643 F.2d 863 (1st Cir. 1981) ............................................. *passim*

*Starling v. OnProcess Tech., Inc.*,
No. 23-cv-10949, 2024 WL 1258501 (D. Mass. Mar. 25, 2024) ...................... 38

*State of Me. v. Fri*,
483 F.2d 439 (1st Cir. 1973) ................................................... 42

*TLT Const. Corp. v. RI, Inc.*,
484 F.3d 130 (1st Cir. 2007) ................................................... 36

*Trustmark Ins. Co. v. John Hancock Life Ins. Co.*,
631 F.3d 869 (7th Cir. 2011) .................................................. 40

*U.S. v. Marino*,
833 F.3d 1 (1st Cir. 2016) ..................................................... 19

*Viking Therapeutics, Inc. v. Ascletis Bioscience Co.*,
No. 22-cv-02062, 2023 WL 6988403 (S.D. Cal. Apr. 3, 2023) .................... 49

*Welsh v. Tex-Mach, Inc.*,
No. 08-cv-11401, 2009 WL 2922955 (D.Mass. Aug. 28, 2009) ...................... 31

*Winter v. NRDC*,
555 U.S. 7 (2008) .............................................................. 37

*Zircon Corp. v. Int'l Trade Comm'n*,
101 F.4th 817 (Fed. Cir. 2024) ...........................................................45

**Statutes**

19 U.S.C. § 1337 ...............................................................................45

19 U.S.C. § 3511 ...............................................................................46

28 U.S.C. § 1659 ...............................................................................16

35 U.S.C. § 1659(a) .......................................................................41, 45

All Writs Act ....................................................................................50

Federal Arbitration Act (FAA), 9 U.S.C. § 1, *et seq.* ..............................15

Mass. Gen. Laws c. 106 § 2-206(1)(b) ...............................................29

Mass. Gen. Laws c. 106 § 2-207(1) .....................................................6

Mass. Gen. Laws. c. 251 § 2(b) ...................................................*passim*

UCC..............................................................................16, 23, 24, 28

UCC § 2-206 ..........................................................................29, 31, 33

UCC § 2-207 ..........................................................................29, 31, 32

Uniform Commercial Code.............................................................6, 15

Uruguay Round Agreements Act.................................................46, 47, 48

**Other Authorities**

1 *Corbin on Contracts* § 1.11 (1993)...................................................24

Fed.R.Civ.P. 65(b)(2)........................................................................42

# INTRODUCTION

The appellants are subsidiaries of Foxconn,[1] a long-time Vicor customer, who switched from Vicor's patented products to infringing knock-off products. Vicor sued at the International Trade Commission (ITC) to stop the infringement. (A48-A94).  Then, **six months into the ITC litigation**, Foxconn asserted for the first time that it (a) actually had unlimited rights to use Vicor's patented technology and (b) could not be sued at the ITC.  (A96-A117).  Both theories were based on Vicor's supposed agreement, by dint of selling parts to Foxconn, to fine-print boilerplate clauses in Foxconn purchase orders (POs).  According to Foxconn, these clauses granted Foxconn a license to Vicor's valuable patents for free and further required Vicor to arbitrate, in China, if it disputed Foxconn's license claim. (A105-A114).

Because Vicor had never agreed to (and had consistently rejected) such clauses, and because it would be irreparably harmed by having to defend against Foxconn's spurious license claim before a Chinese arbitration panel to which it did not agree, Vicor sought protection from the district court.[2]  Vicor first obtained a TRO against the arbitrations by demonstrating that it had responded to each PO

---

[1] Appellants are all subsidiaries of Foxconn, a Taiwanese electronics contract manufacturer.  For simplicity, we refer to them collectively as "Foxconn" except where otherwise noted.  (See Foxconn Br. at 7, n.2).

[2] Because the ITC is not a court, it had no power to grant the injunctive relief Vicor sought.

with its own standard form, a sales order acknowledgment (SOA), that rejected Foxconn's PO terms, and expressly conditioned any sales agreement on assent to Vicor's Standard Terms and Conditions (STCs).  Such a conditional acceptance operates as a rejection, and thus the district court found that "[t]here is no evidence before the Court that [Vicor] accepted these purchase orders."  (A475).

Foxconn then pivoted to a new theory.  Foxconn now claimed that three POs, out of the hundreds tendered by Foxconn over the years, were contractually accepted by emails sent from Vicor Customer Relationship Associates (CRAs). While Foxconn claims that this new email-based theory was revealed during "expedited discovery," (Foxconn Br. at 2-3), the truth is that these emails had been in Foxconn's possession the entire time.  This new theory was also rejected by the district court when it granted the preliminary injunction now under review. (Add.9-Add.40).[3]

The district court concluded that the Vicor emails did not form contracts incorporating Foxconn's boilerplate terms for two main reasons.  First, the POs were not "offers" capable of acceptance, as **they expressly disavowed creating any obligation by Foxconn to purchase Vicor goods**.  (Add.28).  Second, Vicor's emails could not reasonably be interpreted as "acceptances" since Vicor had

---

[3] "Add.XXX" refers to page XXX of the Addendum to Foxconn's brief.  Material in the Addendum to Vicor's brief will be referred to as "V.Add.XXX".

repeatedly notified Foxconn, in its price lists and in hundreds of prior sales transactions, that **Vicor's policy was to respond to purchase orders only through its form SOAs**, and to make sales agreements subject to Foxconn's assent to Vicor's (not Foxconn's) STCs.  (Add.33).  The district court thus rejected Foxconn's "gotcha" theory of contract formation, and issued a preliminary injunction that continued the TRO's bar against Foxconn's attempt to force an involuntary arbitration.  (Add.40).

Given the district court's well-supported factual findings, which are reviewed for clear error, Foxconn focusses this appeal instead on two novel legal theories that supposedly rendered the district court powerless to protect Vicor from Foxconn's specious arbitration demands.  Both theories are wrong.

First, Foxconn claims it was entitled to a stay under 28 U.S.C. § 1659, a statute enacted to prevent **parallel enforcement actions** in the ITC and district court.  However, this is not a parallel enforcement action, so Section 1659 does not apply.  But even if Section 1659 applied, it would be of no avail.  Foxconn requested the stay **after the district court had already issued an order enjoining Foxconn from pursuing the arbitrations until Vicor's preliminary injunction motion ("PI Motion") was decided.**  Nothing in Section 1659 required that order to be vacated.

Foxconn's second theory relies on "international comity." But an injunction implicates international comity only when it intrudes on the "legislative, executive or judicial acts of another nation." *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 18 (1st Cir. 2004). The injunction at issue here only blocks **private arbitrations, which Foxconn claims are authorized by a contract allegedly formed under Massachusetts law**. (Foxconn Br. at 40-45, citing Massachusetts law). Because nothing in the injunction interferes with the government or laws of a foreign sovereign, comity is irrelevant.

The district court's decision should be affirmed.

## ISSUES ON APPEAL

1.    Whether the district court acted within its discretion in enjoining Foxconn from pursuing private arbitrations against Vicor, after finding that Vicor and Foxconn never contracted to Foxconn's arbitration clause, and that Vicor would suffer irreparable harm if forced to arbitrate.

2.    Whether Foxconn's Section 1659 stay request precluded the district court from continuing to enjoin the Foxconn arbitrations, where:

> a. An injunction was already in effect when Foxconn requested its stay and Section 1659 does not require preexisting orders to be vacated;

      b.  Section 1659 was not applicable because the proceeding below was not a parallel enforcement action and thus did not involve the "same issues" as the ITC case; and

      c.  Even if Section 1659 applied, it did not preclude the district court from exercising its equitable power to maintain the status quo and prevent irreparable harm to Vicor until the stay was lifted.

3.    Whether international comity precluded the district court from enjoining private arbitrations, purportedly authorized by an alleged contract formed under Massachusetts law, where the injunction does not interfere with the legislative, executive or judicial acts of another nation.

## STATEMENT OF THE CASE

### A.   Facts of the Case

#### 1.   Vicor's Policies Concerning POs

Vicor is a Massachusetts manufacturer of power converter modules, a type of electronic component used in high-performance computing equipment. (A56).[4]

As a matter of policy, Vicor does not accept POs with non-negotiated terms. Instead, Vicor responds to POs by sending customers a "sales order acknowledgement" (SOA) form. (A963-A964). The SOA restates the volume of

_____

[4] While Vicor has sales and customer support offices in China, its manufacturing operations are in the United States. (A56).

product(s) and the sales price(s), provides dates on which Vicor proposes to ship

the product(s), and includes the following conspicuous language, including a

hyperlink to the full text of Vicor's Standard Terms and Conditions ("STCs")

(A119-A120; A963-A964):

> IMPORTANT NOTICE: THIS ORDER IS SUBJECT TO VICOR
> CORPORATION'S STANDARD TERMS AND CONDITIONS OF SALE,
> INCORPORATED BY REFERENCE INTO THIS DOCUMENT.  THE
> FULL TEXT OF THESE TERMS AND CONDITIONS MAY BE FOUND
> ON THE COMPANY'S WEBSITE:
> HTTP://WWW.VICORPOWER.COM/TERMS CONDITIONS.

The SOAs are typically sent shortly after receiving the POs from customers.

(A120).  Vicor also includes the same conspicuous language and hyperlink when it

invoices customers.  (A964).

Vicor's STCs[5] have at all relevant times contained the following terms,

which include a statement that Vicor's acceptance of a PO (albeit conditional[6])

---

[5] Vicor's STCs were attached as Exhibit B to the Declaration of Mandy Jungjohann
filed in support of Vicor's PI Motion on January 9, 2024. (A133-A143).  Counsel
for Vicor later discovered that, due to a page formatting error, non-referenced
portions of the document as filed had been cut-off.  A complete version of the
document was filed on March 25, 2024, and is Docket No. 42 in the record below.
(V.Add.5-V.Add.15).

[6] As permitted by the Uniform Commercial Code (UCC), Vicor's SOAs expressly
conditioned acceptance of Foxconn's POs on Foxconn's assent to Vicor's standard
terms, which made them counter-offers, rather than acceptances.  *See* M.G.L. c.
106 § 2-207(1); *Com. & Indus. Ins. Co. v. Bayer Corp*, 433 Mass. 388, 393 (2001);
V.Add.2.

requires the delivery by Vicor of an SOA, and that otherwise "[a] Sales Agreement

will not exist" (A120; A964; A966-A968; V.Add.5; V.Add.12, emphasis added[7]):

> **No party has been authorized by Vicor to make any statement** or presentation as to the sale of Goods **inconsistent with these Terms**, and no such statements, if made, will be binding upon Vicor or be grounds for any claim. [V.Add.5 (Section 1)]
> \*\*\*
> [P]rovisions of purchase accompanying a Purchase Order, are hereby rejected and shall be of no effect. [V.Add.5 (Section 1)]
> \*\*\*
> These terms and Conditions of Sale ("Terms") shall be the sole terms and conditions governing the sale of products and services ("Goods") by Vicor…. **Vicor's express acceptance of a Purchase Order under these Terms is evidenced by its delivery of a Sales Order Acknowledgment ("SOA"), and such acceptance of a Purchase Order is expressly conditioned on Buyer's assent to these Terms….** [V.Add.5 (Section 1)]
> \*\*\*
> Only upon delivery by Vicor of a SOA to Buyer shall these Terms and the associated Purchase Order together become a binding, bilateral contract between Vicor and Buyer, with enforceable rights and performance obligations (the "Sales Agreement"). **A Sales Agreement will not exist and Vicor will not be obligated to fulfill a Purchase Order, unless Vicor affirmatively acknowledges the respective responsibilities of Vicor and Buyer through delivery of a SOA to Buyer….** [V.Add.5 (Section 1)]
> \*\*\*
> Any dispute with Buyer in connection with a Sales Agreement may, **at Vicor's sole discretion,** be resolved through binding arbitration in the Commonwealth of Massachusetts, pursuant to the Commercial Arbitration Rules of the American Arbitration Association…. **Vicor, in its sole discretion, may elect to have a judicial forum for dispute resolution**. [V.Add.12, section 29]

---

[7] All emphasis in this brief is added by counsel for Vicor, unless otherwise stated.

**2.    Vicor's Years-Long Course of Dealing with Foxconn**

At least as early as 2018, Foxconn began purchasing products from Vicor through various subsidiaries, including Appellants.  (A966).  Although these subsidiaries appear to be separate corporations, Vicor's relationship with Foxconn is effectively with a single entity.  (A968-A969).

Since 2018, Vicor and Foxconn have had a consistent course of dealing regarding Foxconn's purchase of Vicor products:  Foxconn would email a PO to Vicor.  Vicor would then determine if and when it can fulfill the order, and also whether certain non-preprinted terms of the PO form were correct.  If so, Vicor would respond by emailing an SOA back to the Foxconn employee who sent the PO.  (A149-A150; A163-A164; A995-A997; A999-A1000).

Vicor has transmitted at least 714 such SOAs to Foxconn, and at least 456 were sent before September 30, 2021, the date of the earliest PO relied on by Foxconn in this case.  (A966).

Foxconn has never denied receiving these SOAs, nor denied being aware of Vicor's STCs before the transactions at issue here.

Typically, Foxconn submits a PO to Vicor by emailing it to a Vicor CRA. CRAs are non-managerial employees: they receive sales orders, check them for accuracy, enter them into Vicor's order tracking system, communicate with Vicor's factory to determine if and when the orders can be fulfilled, respond to order status

8

inquiries from customers, and track fulfillment to ensure that orders are timely shipped.  (A970)  Because SOAs are the only authorized mechanism for Vicor to accept (conditionally) a PO, CRAs have no authority to negotiate contract terms with buyers, or to indicate or confirm, via email or otherwise, Vicor's agreement to be bound by the terms of a PO.  (A970-A971).

One part of a CRA's job is to review initial sales orders to make sure they accurately state Vicor's product prices, as well as its standard payment, warranty and delivery terms.  (A970-A971).  The CRA also confirms dates on which Vicor's factory is able to fill the order.  (A970).  As a final step, the CRA will cause Vicor's order tracking system to automatically generate an email to the customer contact which includes an SOA corresponding to the order.  (A971).

### 3.    Foxconn's Disavowal of Any Binding Obligation from its POs

In support of its theory that Vicor is contractually bound to arbitrate, Foxconn claims Vicor accepted small-print arbitration clauses found in three Foxconn POs: PO 4600000176 ("the 176 PO"), PO 4500273265 ("the 265 PO"), and PO 4500277185 ("the 185 PO").  (Foxconn Opening Br. at 40-47).  However each of these purchase orders expressly **<u>disavows</u>** any obligation by Foxconn to purchase Vicor products, (A146; A160; A945).  Each PO states:

> Note 6[:] this PO and any particular DN or delivery request issued by
> Buyer constitute an independent and complete agreement between both

9

parties.  **This PO shall not constitute Buyer's purchase obligation without DN or other delivery requests.  Final quantity and/or delivery date shall be subject to the provision on the most current DN or other delivery request**.

(A146; A160; A945).  "DN" is defined elsewhere in the document ("Note 3") as a "Delivery Notice," which the PO makes clear is a different document from the PO itself.  (A146; A160; A945; Add.27-Add.28).

As the district court found, Foxconn presented no evidence that a "DN or delivery request" was ever provided for any of the POs at issue.  (Add.17 (n. 10); Add.27-Add.29).  Since the POs stated that they were not binding absent a DN, the district court concluded that they were not contractual offers capable of acceptance. (Add.28).

### 4.    Vicor's Handling of the Foxconn POs at Issue

#### a)    The 176 PO

On September 26, 2021, Anita Wang, a Foxconn representative, emailed Peter Goodwin, a Vicor CRA, attaching the 176 PO, which **proposed shipment of certain Vicor products by October 15, 2021**.  (A972; A1012-A1023).  After correcting errors in delivery and payment terms identified by Mr. Goodwin, on September 30, 2021, Ms. Wang sent a revised version of the 176 PO.  (A972-A973; A1025-A1026).  On October 6, 2021, Vicor sent Ms. Wang its SOA form for the 176 PO.  (A975; A149-A150).  **The SOA offered a ship date of May 13,**

**2022**, and included the "IMPORTANT NOTICE" making the order subject to Vicor's STCs, with a hyperlink thereto. (A150).

On September 30, 2021, Caroline Lee, a Foxconn representative who was not on the email string with Anita Wang, and who did not tender the 176 PO to Vicor, emailed Mr. Goodwin asking: "Do you have an update on docking status of PO#4600000176?" (A973, A1032). Mr. Goodwin responded with an email that stated: "Hi Carolyn, PO# 4600000176 ......... 2K ship date 5-13-22, 2K 5-20, 2K 5-27 and 1400 6-3. Peter." (A973; A1032). Mr. Goodwin's email was not an acceptance of the 176 PO or a promise to ship goods. Rather, it was an indication of what shipping dates Vicor had determined to be feasible. (A973-A974). It was provided to Foxconn as a courtesy to allow Foxconn to understand before receiving Vicor's SOA what shipping dates would likely be included. (A973-A974).

After more questions from Ms. Lee (not Ms. Wang) about ship dates, on October 6, Mr. Goodwin offered "5-13-22" as a ship date for all goods listed in the 176 PO (rather than as the first of four such dates). (A974; A1032; A1046; A1047). The record does not reflect any further response from Ms. Lee.

**b)    The 265 PO**

The 265 PO had a unique and tortured history. It was created in 2023 after Foxconn informed Vicor that it wished to cancel a prior PO numbered 4500317991

("the 991 PO"), which had been tendered two years earlier, in 2021.  (A975).

Because Vicor sent an SOA in response to the 991 PO and Foxconn did not object

to it, Vicor considered the 991 PO order to be non-cancellable and non-

reschedulable (NCNR).  *Id.*  Still, as an accommodation to Foxconn, Vicor

proposed to shift a portion of the products ordered in the 991 PO to a different PO.

(A975).

Foxconn eventually agreed, and in an email dated May 31, 2023, Signe Shi,

a Foxconn representative, asked Vicor to transfer 6270 units from the 991 PO to a

new 265 PO.  (A978; A1081).

What followed was a series of emails, over the two-week period between

June 1 and June 13, 2023, from another Foxconn representative named Liz Liu.

(A978-A981).  During this period, Ms. Liu sent Vicor a sequence of ever-evolving

versions of the 265 PO to Alice Salamanca, a Vicor CRA.  (A978-A981; A1119-

A1214).  Ms. Salamanca responded to Ms. Liu with requests that Foxconn make

corrections to accurately reflect Vicor's standard delivery terms and warranty

period.  (A979-A980).[8]

Ms. Liu eventually transmitted to Ms. Salamanca the final version of the 265

PO, with the requested changes, on June 14, 2023 at 8:34PM EDT.  (A980; A1185-

---

[8] Ms. Liu also sent a number of emails to Vicor that appeared to reflect confusion
as to status of the proposed new arrangement.  (A979; A1111; A1119-A1120).

A1194).  Three hours later, at 11:30pm EDT, Vicor emailed its SOA for the 265 PO to Signe Shi of Foxconn (who had originally requested the PO change), including the "IMPORTANT NOTICE" making the order subject to Vicor's STCs, with a hyperlink thereto.  (A981; A1213-A1214).

Meanwhile, on June 6, 2023, in a separate thread, Mandy Jungjohann, a Vicor manager, responded to Ms. Shi's May 31 email, stating she would need to "double check" whether the requested substitution was ok.  (A1099).  On June 6 Ms. Liu responded to Ms. Jungjohann and to Ms. Salamanca stating "please confirm the latest delivery date for the Taiwan orders."  (A978; A1098).  On June 13, 2023, Ms. Salamanca responded to Ms. Liu: "PO# 4500273265 … Qty 6,270 pcs scheduled for 9/29/23 ship.  As requested PO# 4500317991 was reduced by qty 6,270."  (A980; A1178).  By this email, Ms. Salamanca was providing an updated ship schedule (for parts already under production to fill the 991 PO), as a courtesy to Ms. Liu, and in accordance with Ms. Jungjohann's June 6 email stating "the team will review your need dates and advise back what is needed for revised POs for the transfer, as well as the ship schedule."  (A980; A1086).[9]

---

[9] Ms. Jungjohann's declaration mistakenly identifies her prior email as having been sent on May 31, 2023.  (A980).

### c)   The 185 PO

On November 28, 2023, Owen Wang of Foxconn provided an unsigned draft of the 185 PO.  (A982; A1218-1221).  The draft did not include Foxconn's arbitration clause and included a "delivery date" of March 28, 2024.  (A982; A1218-1221).  Mr. Wang later followed up with a signed copy on December 4, 2023.  (A982; A1223-A1225).

On December 5, 2023, Ms. Salamanca replied to Mr. Wang's **November 28, 2023** email, attaching the unsigned version of the 185 PO that Mr. Wang had sent on November 28 (without the arbitration clause), and stating: "Thanks for the new order.  Here's the ship dates:

Line 1 for 15,390 pcs MCM4609S59Z01C5T00 for 2/29/24 ship.

Line 2 for 2,880 pcs MCD4609S60E59H0T20 for 12/29/23 ship

Line 3 for 5,760 pcs DCM3110S60E02A3TN0 for 1/19/24 ship"

(A983; A1227-A1230).

A few hours later, on December 6, 2023 at 4:17am, Vicor sent an SOA for the 185 PO to Mr. Wang.  (A983; A1232-1233).  The SOA stated "scheduled ship dates" of December 29, 2023, January 19, 2024, and February 29, 2024 and included the "IMPORTANT NOTICE" making the order subject to Vicor's STCs, with a hyperlink thereto.  *Id.*

**B.    Procedural History**

Vicor filed this action on January 8, 2024, seeking injunctive relief that would bar Foxconn from pursuing private arbitrations[10] against Vicor in China.[11] (A7-A19).  Vicor grounded its request for an injunction in both the Federal Arbitration Act (FAA), 9 U.S.C. § 1, *et seq.*, and Mass. Gen. Laws. c. 251 § 2(b) (V.Add.22), which directs that courts "**shall order a stay of arbitration**" after determining that "there is no agreement to arbitrate."  *Id.*

On January 9, 2024, Vicor filed its PI Motion (A20-A44), followed two days later by its motion for a TRO ("TRO Motion") (A173-A184).  Vicor's motions pointed out that Vicor had responded to each Foxconn PO with its standard form SOA, including the "IMPORTANT NOTICE" making acceptance of the order "expressly conditioned on Buyer's assent to [Vicor's STCs]."  (A27-A28; A180).  Vicor pointed out that the Vicor STCs conflicted with the arbitration clause in the Foxconn POs, and therefore, under the Uniform Commercial Code (UCC), no contract including the Foxconn arbitration clause was ever formed (a conditional

---

[10] Foxconn instituted the arbitrations before the China International Economic and Trade Arbitration Commission (CIETAC) (A186-A207), a part of the China Chamber of International Commerce.  (A220).

[11] Foxconn's assertion that "Vicor employed this action to manufacture additional evidence for its ITC action" (Foxconn Br. at 31-32) is baseless.  All the evidence developed in this case came from a Vicor employee and documents already in Vicor's possession.

acceptance operating as a rejection and counteroffer under the UCC).  (A37-A38; A180-A181).  Foxconn filed its written opposition to the TRO Motion on January 16, 2024.

On January 19, 2024, the Court held a hearing on both the TRO Motion and the PI Motion (A4), and later that day issued a written order granting Vicor's TRO Motion, which enjoined Foxconn from "pursuing the arbitrations against Vicor" and ordered Foxconn to take steps necessary to "stay the arbitrations … pending resolution of the motion for preliminary injunctive relief."  (V.Add.1-V.Add.4). The district court's order found that "there is no evidence" that Vicor had accepted the Foxconn POs.  (A475).  The order stated that the court was issuing the TRO "to preserve the Court's power to resolve more fully all of the issues in dispute to the extent warranted" and that the TRO would expire "upon this Court's resolution of the pending motion for a preliminary injunction."  (A476-A477).

On January 22, 2024—three days **after** the TRO was entered—Foxconn filed an Emergency Motion to Stay Under 28 U.S.C. § 1659 and to Vacate Temporary Restraining Order.  (A478-A496) ("Vacate and Stay Motion"). Foxconn argued that under Section 1659, it was entitled to a "complete stay of all proceedings" in the district court.  (A490).  Foxconn further argued, despite the lack of any statutory authority, that it was also entitled to "relief from all pending orders."  (A490).

On January 23, 2024, the Administrative Law Judge hearing the ITC action ruled that Foxconn had waived any right to terminate the ITC proceeding in favor of arbitration because it had failed to timely raise the issue before the ITC. (V.Add.16-V.Add.21).  Despite this ruling, Foxconn has not withdrawn its arbitration demands which, if successful, would create the very multiplicity of litigation that it ostensibly seeks to avoid.

On February 16, 2024, the district court ruled on Foxconn's Vacate and Stay Motion.  (Add.1-Add.8).  While finding that Section 1659 applied to the pending action, and "prevents the Court from reaching a final resolution of any of the issues pending before it" (Add.7), the court concluded that "the statute neither requires the Court to vacate the TRO nor precludes the Court from proceeding toward resolution of the" PI Motion.  (Add.5).  Accordingly, the Court denied Foxconn's motion "to the extent it seeks an order vacating the TRO already entered" and "to the extent it seeks an order staying this action insofar as a resolution of the pending Motion for Preliminary Injunction … that mirrors the relief provided in the TRO is concerned."  (Add.8).

On March 7, 2024, Foxconn filed its opposition to the PI Motion (A907-A932) and articulated, for the first time, its theory that Vicor had accepted the POs in question by sending emails about feasible ship dates in response to Foxconn inquiries.  (A919-A925).

On March 28, 2024, Vicor filed its reply supporting its PI Motion. (A763-A771). In order to respond to Foxconn's new "email acceptance" theory, Vicor included with its reply a supplemental declaration from Ms. Jungjohann (A962-A991) (Supplemental Jungjohann Declaration), which provided necessary context, including the parties' multi-year prior course of dealing, to understand the email exchanges on which Foxconn was now relying. (A968-972).

The district court held a hearing on Vicor's PI Motion on May 14, 2024. During the six-week period between the filing of Vicor's reply and the hearing date, Foxconn objected to neither the reply nor the Supplemental Jungjohann Declaration, nor did it seek to file a sur-reply brief to respond to them. At the hearing Foxconn belatedly asked the court to strike Vicor's reply and the Supplemental Jungjohann Declaration, which the court denied. (Add.15-Add.16).

The district court issued its PI Motion decision on June 24, 2024 ("PI Order"). (Add.9-Add.40). The Court issued a preliminary injunction that continued the existing TRO's bar on pursuing the CIETAC arbitrations, "pending resolution of this case." (Add.40). The district court once again found that Vicor was likely to demonstrate that "it did not agree to arbitrate any disputes with Defendants before CIETAC in China," and that Vicor would suffer irreparable harm if forced to do so. (Add.35-Add.36).

## STANDARD OF REVIEW

A district court's decision to grant a preliminary injunction is reviewed for "abuse of discretion" as a whole, with factual determinations reviewed for "clear error" and issues of law reviewed *de novo*.  *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 97 (1st Cir. 2011).  Such review is "deferential" because "decisions to grant or deny injunctive relief can best be made by trial courts steeped in the nuances of a case and mindful of the texture and scent of the evidence."  *Hiller Cranberry Prods. v. Koplovsky¸*165 F.3d 1, 4 (1st Cir. 1999).

For a factual determination to be overturned for "clear error" the judge must, in the words of this Court, have "got things wrong with the force of a 5 week old, unrefrigerated, dead fish."  *U.S. v. Marino*, 833 F.3d 1, 8 (1st Cir. 2016).

While this Court has applied an "intermediate level of scrutiny" to the issuance of an "international anti-suit injunction," *Quaak*, 361 F.3d at 16, that standard does not apply here, since the injunction appealed from is not an anti-suit injunction.  It is directed solely to the stay of a **<u>private arbitration</u>** and does not in any way "interfere[e] with the judicial processes of a foreign sovereign," or "restrict[] the jurisdiction of a foreign sovereign's courts."  *See id* at 16-17.

A district court's case management decisions, such as whether to grant a motion to strike, are reviewed for abuse of discretion.  *F.D.I.C. v. Kooyomjian*, 220 F.3d 10, 16 (1st Cir. 2000).

Federal courts apply a four-part test before granting preliminary injunctions, requiring plaintiffs to demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of the equities weighs in their favor, and (4) the injunction is in the public interest. *March v. Mills*, 867 F.3d 46, 52-53 (1st Cir. 2017).

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion by entering a TRO enjoining the Chinese arbitrations nor in later converting the TRO to a preliminary injunction. Accordingly, the Court should affirm the district court's PI Order. Alternatively, if the Court concludes that Foxconn's requested stay under Section 1659 barred the district court from ruling on Vicor's PI motion, the Court should restore the status quo at the time the stay was granted by reinstating the TRO until the PI Motion is resolved.

**Success on the merits:** The district court correctly determined that Vicor was likely to succeed on the merits. The district court correctly determined that the Foxconn POs, which expressly disavowed any commitment to purchase Vicor products, were not "offers" that could be accepted to form a contract. The district court also did not clearly err in finding that the Vicor emails relied upon by Foxconn in this appeal could not reasonably have been understood as acceptances of the Foxconn POs, and thus did not form contracts based on the POs boilerplate

terms, in view of (a) Vicor's clearly conveyed and non-negotiable policy of accepting POs only via SOAs, which condition acceptance on the buyer's agreement with Vicor's STCs, and (b) the lack of any indication of acceptance in the emails themselves.

**Irreparable harm:** The district court's finding that Vicor would "face irreparable harm from having to proceed to arbitrate," was not clearly erroneous. The weight of authority holds that forcing a non-consenting party to arbitrate causes irreparable harm. Moreover, Vicor has, under Massachusetts law, a substantive right not to be forced to arbitrate if there was no agreement to do so. M.G.L. c. 251 § 2(b); *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863, 864 n.1 (1st Cir. 1981). Such a right would be irreparably lost if Vicor was forced to arbitrate.

**Section 1659:** Foxconn's request for a Section 1659 stay did not preclude the district court from enjoining the Foxconn arbitrations. First, **before** Foxconn requested its stay, the district court had already issued an order, after full briefing and a hearing, enjoining Foxconn from proceeding with the arbitrations "pending resolution of the motion for preliminary injunctive relief." (A477). Even if Foxconn was entitled to a stay, nothing in Section 1659 required the district court to vacate that order. But Foxconn was not entitled to a stay. Section 1659 allows a defendant to request a stay only when a district court case entails a "claim that

involves the same issues" as an ITC proceeding.  The precise meaning of that phrase is ambiguous, and so it is appropriate to look to the statute's purpose as reflected in its structure and legislative history.  The statute's structure and legislative history show that its purpose was to shield a respondent before the ITC from being forced to defend itself at the same time in a parallel **enforcement** action (*e.g.*, a patent infringement case) in district court.  This is not such a case.  Moreover, multiple courts have concluded that the grant of a Section 1659 stay does not prevent them from addressing ancillary matters, including preliminary injunctions.

**Comity**: Foxconn misapplies the doctrine of international comity to suggest that the district court's injunction must be vacated to avoid an "arms race with foreign courts."  Foxconn Br. at 34.  Foxconn's invocation of comity is inapposite because, unlike the authorities Foxconn relies upon, the district court's injunction does not conflict with the "legislative, executive or judicial acts of another nation." *Quaak*, 361 F.3d at 18-19.  The injunction blocks the institution of a **private arbitration purportedly authorized by a contract** that Foxconn alleges was **formed under the laws of Massachusetts** and the relief Vicor seeks **is expressly authorized by Massachusetts law, and permissible under the Federal Arbitration Act**.  Mass. Gen. Laws c. 251 § 2(b); *Societe Generale*, 643 F.2d at 864 n.1.  Since nothing in the district court's order interferes with any foreign court

or other government agency or the operation of foreign law, comity is irrelevant to the propriety of the district court's injunction.

## ARGUMENT

### A. The District Court Did Not Abuse Its Discretion in Issuing the Injunction

#### 1. The District Court Correctly Concluded that Vicor Was Likely to Succeed on the Merits

After scrutinizing the evidence, the district court concluded that Vicor was likely to succeed in proving that Vicor was not bound by the arbitration clause found in the Foxconn POs. (Add.25-Add.35). The district court's conclusion was supported by two alternative grounds: (a) that the Foxconn POs were not offers that, if accepted, would form binding contracts (Add.27-28), and (b) that even if the POs were offers, Vicor's email exchanges with Foxconn did not accept the POs and thus did not establish contracts including the PO boilerplate terms (Add.28-Add.35). Both grounds are correct, and either is a basis for affirmance.

##### a) The Foxconn POs Were Not Offers Capable of Acceptance[12]

Under the UCC, a binding contract is formed when one party makes an "offer" that is accepted by the other. *I & R Mechanical,* 62 Mass. App. Ct. 452,

_____

[12] Foxconn claims to have been blindsided by this argument in Vicor's PI Motion reply brief. (Foxconn Br. at 48). However, as the district court correctly observed, Vicor raised this issue at the hearing on its TRO motion on January 19, 2024, six weeks before Foxconn filed its PI Motion opposition. (Add.16; January 19, 2024

455, 817 N.E.2d 799, 802 (2004). However, "the term 'offer' is not defined in the [UCC], and the common law definition remains relevant." *Id.* at 457. Under common law, "the insertion into a proposal of a clause that reserves to its maker the power to close the deal is a compelling indication that the proposal is not an offer." *Bourque v. F.D.I.C.*, 42 F.3d 704, 709 (1st Cir. 1994) (citing E. Allen Farnsworth, *Contracts* § 3.10, at 139 (2d ed. 1990)). Similarly, a "manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." *Restatement (Second) of Contracts* § 26 (1981). *See also* 1 *Corbin on Contracts* § 1.11 (1993) ("So long as it is reasonably apparent that some further act of the purported offeror is necessary, the purported offeree has no power to create contractual relations, and there is as yet no operative offer.").[13]

On the record before it, the district court correctly found that the POs were not "offers" that Vicor could accept. (Add.27). As the district court noted, each

---

Hearing Transcript at 30:2). The district court did not abuse its discretion in considering the argument.

[13] Contrary to Foxconn's assertion (Br. at 49), Vicor's sending of SOAs in response to POs, which included language of "conditional acceptance," has no bearing on whether the POs were binding offers in the first place. Vicor's SOAs did not treat the POs as binding offers. Rather, they expressly required Foxconn to take further action, to "assent" to Vicor's terms, before a contract would be formed. (A120; A134, Section 1).

Foxconn PO contained the following express disclaimer: "This PO **and** any **particular** DN [Delivery Notice] or delivery request issued by [Foxconn] constitute an independent and complete agreement between both parties. This PO **shall not constitute [Foxconn's] purchase obligation without DN or other delivery requests**." (Add.27, emphasis added by district court). The POs also stated that "[f]inal quantity and/or delivery date shall be subject to the provisions of the most current DN or other delivery requests." (Add.17). The district court properly interpreted this language to mean that Foxconn "must issue a 'DN or delivery request' before an agreement is formed." (Add.27). Finding that "Vicor has established that there is no such document, either express, implied, or de facto, associated with any of the four POs at issue," the court correctly concluded that Vicor's email responses to the POs could not and did not create a binding contract. (Add.28).

Additionally, the Foxconn POs could not result in a contract because any resulting agreement would have lacked consideration. *See Neuhoff v. Marvin Lumber and Cedar Co.*, 370 F.3d 197, 201 (1st Cir. 2004) ("A contract must have consideration to be enforceable"); *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 7 (1st Cir. 1994) ("[t]he law requires mutuality of obligation as a prerequisite to a binding bilateral contract.") Here, Foxconn made no promises in its POs. *See Gill v. Richmond Co-op. Ass'n*, 309 Mass. 73, 80, 34 N.E.2d 509, 514

(1941) ("Since the plaintiffs bound themselves to nothing, the defendant received no consideration...."). It expressly disavowed any commitment to purchase goods from Vicor without first sending another document, a "DN or other delivery request," which the PO did not obligate Foxconn to do. Since the PO "bound [Foxconn] to nothing," *Gill*, 309 Mass. at 80, Vicor had received no consideration at the time of the supposed acceptances, and no contract was formed.

Foxconn does not appear to dispute the district court's analysis of the PO language, and its conclusion that Foxconn needed to issue a "DN or other delivery request" before the POs would mature into offers capable of acceptance. (Foxconn Br. at 49-50). Nor does Foxconn appear to dispute the district court's conclusion that Vicor would have needed to "accept" any such "DN or other delivery request" for a contract to be formed. (Add.28). Instead, Foxconn insists, contrary to the district court's fact-finding, that "the record contained delivery requests" and thus "the district court therefore erred in holding that the purchase orders … were not offers." (Foxconn Br. at 50).

Foxconn's argument should be rejected. The district court analyzed the record evidence and found that "there is no [DN or other delivery request], either express, implied, or de facto, associated with any of the four POs at issue." (Add.28). This finding was not clearly erroneous. While Foxconn now points to an email relating to the 265 PO in which Foxconn asks Vicor to "confirm the latest

delivery date," (Foxconn Br. at 50), Foxconn never relied on this language in the

proceedings below as constituting a "DN or other delivery request" for any PO,

and so the argument is waived. *See Johnston v. Holiday Inns, Inc.*, 595 F.2d 890,

895 (1st Cir. 1979). In any event, nothing in the identified email contains a

specific request for Vicor to deliver any particular quantity of goods or to do so on

a particular date, which the district court found, not clearly erroneously, would

necessarily be included in a DN. (Add.29). The cited email is not a delivery

request, but merely asks Vicor for information as to **Vicor's plans**.

Foxconn also points to various emails (A935; A948) that contain the term

"WDN" in their subject line, and asserts, without citation to any evidence, that

"WDN" refers to a "weekly delivery notice." But the district court considered this

argument below, and correctly rejected it. The court stated that "Defendants' slide

deck does point to one email … which contains a long, alphanumeric string that

includes the letters 'DN.' The Court declines to construe that document, on that

basis, as a 'DN' or 'delivery notice' as no reasonable person reading the document

would so conclude based on the string of letters, without more." (Add.28, n.19).

This finding was also not clearly erroneous.

Moreover, a careful review of the emails relied on by Foxconn shows that,

whatever the meaning of "WDN" in the subject line of these messages, they were

not referring to delivery notices **for the POs at issue here.** In the case of the June

27

6, 2023 email identified at A935, purportedly relevant to the 265 PO, it was part of a long string of emails with the same cryptic subject line "INGRASYS XUS0010389==>WK22 WDN FR:Signe" that began on May 29, 2023.  (A935-A937).  But the original email with "WDN" in its subject line does not refer to any of the Foxconn POs at issue here, and it was sent **prior to** June 1, 2023, the date on which Foxconn sent its first, unsigned, draft of the 265 PO to Vicor (a draft that did not even include Foxconn's arbitration clause).  (A978; A1091-A1096).  Thus, whatever "WDN" in the subject line was referring to, it was not referring to the 265 PO, and could not logically be the "DN" for a PO that did not yet exist.

A similar analysis applies to the December 6, 2023 email at A948, which purportedly relates the 185 PO.  The "WDN" in its subject line originated in a November 24, 2023 email (A949) that predates Foxconn tendering the first (unsigned) draft of the 185 PO to Vicor on November 28, 2024 (a draft that also did not contain the Foxconn arbitration clause).  (A982; A1218-1221).

> ### b)  Even Assuming the Foxconn POs Were Offers, the District Court Did Not Clearly Err in Finding that the Vicor Emails Were Not Acceptances Under the UCC[14]

Even if the Foxconn POs had been offers capable of acceptance, the district court did not clearly err in finding that the Vicor emails were not acceptances of

---

[14] Foxconn criticizes the district court for considering supplemental evidence provided by Vicor with its PI Motion Reply.  However the district court acted

the POs.[15]  In asserting otherwise, Foxconn relies on two theories.  First, Foxconn

contends that the Vicor emails were "sufficient to show agreement" to Foxconn's

POs under UCC section 2-206(1)(b), which states that "[u]nless otherwise

unambiguously indicated by the language or circumstances" an "order or offer to

buy goods for prompt or current shipment shall be construed as inviting acceptance

by  . . . a prompt promise to ship . . . ." Mass. Gen. Laws c. 106, § 2-206(1)(b).

(Foxconn Br. at 40-43).

### The "prompt promise to ship" theory – the '176 PO

In support of its "prompt promise to ship" theory, Foxconn relies primarily

on the email by Vicor's CRA Peter Goodwin to Foxconn representative Carolyn

---

within its discretion in considering this additional evidence, which responded to
the new "email-acceptance" theory raised in Foxconn's opposition brief, noting
that the briefing schedule "necessarily contemplated that Defendants would have
the opportunity to submit evidence not previously before the Court along with their
opposition.  **Obviously, understandably, and reasonably, Vicor responded to
this submission with further arguments and evidence of its own**."  (Add.15).
Furthermore, Defendants had the opportunity to address this evidence with a fifty-
page slide deck, and at no time requested an opportunity to submit additional
evidence.  (Add.16).

[15] Foxconn originally contended that Vicor's SOAs accepted Foxconn's arbitration
clause.  (A302-A303).  They did not.  As the district court found (V.Add.2), the
SOAs rejected the Foxconn PO terms, and constituted conditional offers to fill
Foxconn's orders subject to Vicor's assent to Vicor's STCs.  *See Ionics, Inc. v.
Elmwood Sensors, Inc.*¸110 F.3d 184, 189 (under UCC § 2-207, no contract was
formed by an acceptance that is expressly made conditional on assent to additional
or different terms).  Foxconn has not, in this appeal, suggested otherwise.

Lee proposing "ship date[s]" **seven months** after the date specified in the 176 PO.
*See* pages 10-11, *supra*.

There are several problems with Foxconn's reliance this email.  First, Mr.
Goodwin's email was not a "prompt promise to ship," nor was it responding to an
"order or offer to buy goods for prompt or current shipment."  On its face, Mr.
Goodwin's email was not promising to ship anything, but was simply providing
Foxconn with information about when it would be feasible for Vicor to ship the
products in question.  (A973-A974; A461).  Indeed, there is no evidence that Mr.
Goodwin was even responding to the supposed "offer" contained in the 176 PO,
which had been sent earlier that day by a different Foxconn employee, Anita Wang,
on a different email string.  (A972-A973; A1025).

Moreover, as Vicor's declarant, Ms. Jungjohann, explained, Vicor had a
consistent policy over the course of hundreds of previous sales transactions with
Foxconn, spanning many years, of only providing Vicor's response to Foxconn's
form POs with its own form SOAs.  (A963-A964).  CRAs, such as Mr. Goodwin,
were not authorized to accept POs.  (A970; Add.33).  Moreover, in view of the
parties' extensive course of dealing, the district court found, not clearly
erroneously, that Foxconn was "on notice of Vicor's position that its SOAs were
Vicor's only method of acceptance of a PO," and thus Foxconn "could not and did
not reasonably understand the email exchanges to constitute agreement to the terms

set out in the POs."[16] (Add.33). *See Maurice Electrical Supply Co., Inc. v. Anderson Safeway Guard Rail Corp.*, 632 F.Supp. 1082, 1088 (D.D.C. 1986) (relying on prior "course of dealing" between the parties to conclude seller "did not intend to be bound until it accepted plaintiff's orders by issuing an acceptance form.").

Finally, Foxconn's wooden interpretation of UCC Section 2-206(1)(b)'s "prompt promise to ship" language to cover the Goodwin email makes no practical sense and leads to an absurd result. According to the statute, Section 2-206(1)(b) applies only when the purported offer is "an order or offer to buy goods for prompt or current shipment," *i.e.*, when the purchaser expresses an immediate need for these goods. Yet under Foxconn's interpretation, any "prompt" response offering to ship any quantity of the requested goods, even if the shipment is scheduled

---

[16] *Welsh v. Tex-Mach, Inc.*, No. 08-cv-11401, 2009 WL 2922955, at *8 (D. Mass. Aug. 28, 2009), relied on by Foxconn (Br. at 54), is inapposite. In *Welsh* the court found that a boilerplate indemnification term in a seller's invoice was an "unfair surprise" and thus an unenforceable "material alteration" of a prior oral contract under UCC § 2-207(2). In doing so, the court rejected the seller's claim that because it included similar terms in prior invoices sent to the buyer, this established a course of dealing, negating any "unfair surprise." The court reasoned that inclusion of the term in prior invoices would have been similarly ineffective surprises and thus there was no actual course of dealing indicating the buyer's prior **agreement** to the term. *Welsh*'s reasoning has no relevance here: the determinative issue is not whether Foxconn had previously **agreed** with Vicor's policy of relying exclusively on SOAs to respond to POs, but only whether Foxconn's **knowledge** of that policy made it objectively unreasonable to interpret the Vicor emails as acceptances.

months or even years later, must be interpreted as an acceptance, thereby binding the buyer to pay for goods that might not be shipped until long after its immediate need for them had expired.  The more rational reading of the statute is that a "prompt promise to ship" is a promise that is consistent with both the quantity and timing expressed in the order for "prompt or current shipment."  Vicor's identification of potential ship dates seven months after those specified in the 176 PO clearly could not be understood as such a promise.

Foxconn relies on *Extrusion Painting v. Awnings Unlimited*, 37 F.Supp.2d 985 (E.D. Mich. 1999), to support its "prompt promise to ship" theory, but it is easily distinguished: the "promise" in that case was, in fact, a direct response to the PO that agreed with the purchase order as to both quantity and timing.  *Id.* at 988-989, 994.  Thus, unlike this case, there was (a) a direct response to a purchase order, that (b) contained an unambiguous promise to (c) ship the ordered goods within the time frame requested.

### The email acceptance theory – the 265 PO

Foxconn's second theory—the email acceptance theory—relies instead on UCC Section 2-207(1) (Foxconn Br. at 43-46) and fares no better.  That section states that "**a definite and seasonable expression of acceptance or a written confirmation** which is sent within a reasonable time operates as an acceptance…." The flaw here is that none of the emails relied on by Foxconn could reasonably

have been construed to be a "definite expression of acceptance" of any of the POs in question, given the facts.  *See* UCC Section 2-206 (an offer to make a contract "shall be construed as inviting acceptance in any manner … **<u>reasonable in the</u>** **<u>circumstances</u>**"); *Greene v. Ablon*, 794 F.3d 133, 147 (1st Cir. 2015) ("A party's intent is deemed to be what a reasonable man in the position of the other party would conclude his objective manifestations to mean.").

As a general matter, and as the district court found, not clearly erroneously, Foxconn was on notice that the issuance of SOAs was Vicor's only method of accepting (conditionally) Foxconn POs.  (Add.33; A963-A964).  Vicor's STCs spelled this policy out explicitly, stating that "[a] Sales Agreement will not exist …. unless Vicor affirmatively acknowledges the respective responsibilities of Vicor and Buyer through delivery of a SOA to Buyer."  (A964).  Foxconn had been notified of this policy hundreds of times prior to the transactions in question, because Vicor incorporated it into the price lists that it sent to Foxconn (Add.33; A967-A968; A1001-1009), as well as into the hundreds of SOAs that Vicor had consistently sent to Foxconn to conditionally accept previous Foxconn POs.  (Add.33; A967-A968).  The parties' actual prior course of dealing itself – hundreds of POs conditionally accepted by hundreds of SOAs (A966-A967) – further supports the district court's finding that Foxconn was put "on notice" that "SOAs were Vicor's only method of acceptance of a PO, and that agreements were formed

only upon Vicor's terms and conditions—terms which the [Vicor] CRAs could not alter." (Add. 33). In view of the foregoing, and as the district court found, Foxconn could not reasonably, under the circumstances, have considered the Vicor emails to be expressions of intent to be bound by the POs. (Add.33). *See Maurice Electrical Supply*, 632 F.Supp. at 1088.

A review of the specific email exchanges relied on by Foxconn reinforces this conclusion. For example, Foxconn points to a June 13, 2023 email sent by Alice Salamanca, a Vicor CRA, that included the statement -- "scheduled for 9/29/23 ship" -- to argue that Vicor had accepted the 265 PO by email a few hours before the SOA for that 265 PO was emailed to Foxconn. (Foxconn Br. at 43-44). But the Salamanca email does not purport to accept or confirm a Foxconn PO. It merely provides ship dates for a quantity of goods.

Moreover, Foxconn leaves out critical context. The particular goods referenced in Ms. Salamanca's June 13 email were goods that had been ordered by Foxconn as part of a much larger PO (the 991 PO) ***more than two years earlier***. Vicor had already responded to that PO with an SOA. (A1062). After Foxconn attempted to cancel the order (A975-A977; A1064-A1079), Vicor offered to move the goods from the 991 PO to another PO specifying delivery to a different Foxconn subsidiary. (A975-978; A1078). Foxconn agreed and sent the 265 PO to reflect this. (A978; A1081). No emails subsequent to the 991 SOA could have

34

operated as—or been interpreted as—a contractual acceptance of an order for goods already identified in the 991 SOA. After that time, the parties were just discussing where the goods would be delivered.

The "9/29/23 ship date" referred to in Ms. Salamanca's June 13 email was the date on which Vicor had originally planned to ship the goods under the 991 PO, as it had previously notified Foxconn. (A977; A1076). Ms. Salamanca's email was merely confirming that Vicor had reassigned those parts to the 265 PO. (A980).

Given the context of the parties' prior dealings and the particular context of this transaction (transferring parts from one PO to another), Ms. Salamanca's June 13 email is readily understood as discussing the planned issuance of an updated SOA for goods she understood were already subject to a contract based on the 991 SOA (incorporating Vicor's STCs). That SOA was, in fact, sent the next day. Ms. Salamanca's email was not an "acceptance" of the 265 PO. *See JSW Steel USA Ohio, Inc. v. Marubeni-Itochu Steel Am., Inc.*, 573 F.Supp.3d 1212, 1217-18 (S.D. Ohio 2021) *vacated on other grounds,* No. 20-cv-03415, 2022 WL 18572393 (S.D. Ohio April 14, 2022) (statement that seller would get POs "in our system tomorrow and send acknowledgements" was non-binding expression of an "intent to accept.").

Moreover, Foxconn's insistence that a binding agreement existed as of Ms. Salamanca's June 13 email is also inconsistent with Foxconn's own subsequent behavior after Ms. Salamanca's email was received. *See TLT Const. Corp. v. RI, Inc.*, 484 F.3d 130, 135-136 (1st Cir. 2007) ("there is no surer way to find out what the parties meant, than to see what they have done."). After Ms. Salamanca's email, Foxconn revised the 265 PO. Had Foxconn believed Ms. Salamanca's email operated as a contractual acceptance (and thus bound both parties), Foxconn would not have sent Vicor a revised PO. (A980; A1185-A1194). Foxconn later requested cancellation of the 265 PO entirely. (A980-A981; A1196). Evidently, Foxconn did not consider Ms. Salamanca's email to create a binding agreement.[17]

### The email acceptance theory – The 185 PO

Foxconn's attempt to find an email acceptance of the 185 PO also fails. Foxconn points to a December 5, 2023 email by Ms. Salamanca, referring to "ship dates" for the 185 PO. Foxconn asserts that Ms. Salamanca's email was "accepting" a December 4, 2023 version of the 185 PO. That cannot be correct. Ms. Salamanca's email is actually a response to a November 28, 2023 email, which

---

[17] Foxconn mischaracterizes Vicor's response to Foxconn's requested cancellation as an assertion that Vicor considered Foxconn 265 PO to be "already done." (Foxconn Br. at 44). That is incorrect. Vicor's email merely reminded Foxconn that the original 991 PO (from two years prior) was non-cancellable, and that **if Foxconn wished to cancel the 265 PO, it could**, but the goods would need to be transferred back to the 991 PO. (A981).

attached an unsigned draft of the 185 PO **that did not include any arbitration clause**.  (A1218-A1221).  Ms. Salamanca even attached that same unsigned November 28 draft to her response.  (A1227-A1230).  Thus, any possible "acceptance" by Ms. Salamanca's email (and it was not an "acceptance") would have been of a PO without an arbitration clause.

### 2. The District Court's Finding of Irreparable Harm was Not Clearly Erroneous

In granting both the TRO and the PI the district court found that "Vicor would face irreparable harm from having to proceed to arbitrate overseas when a contract either provides for arbitration in the United States or not at all and, in any event, does not provide for arbitration before CIETAC."[18]  (Add.36).  As the district court explained when it granted the TRO:

> This is particularly so when the failure to appear in the arbitration proceeding before CIETAC results in a default award.  Here the stakes are high as the Defendants assert their purchase orders not only require arbitration, but give rise to a license to use Plaintiff's intellectual property beyond just using the particular products purchased.

(V.Add.3).

The district court's finding was not clearly erroneous.  As many courts in multiple jurisdictions have found, without the need for extensive analysis, a party

---

[18] Thus, unlike the case of *Winter v. NRDC¸* 555 U.S. 7, 21 (2008), the district court did not grant the injunction based on a mere "possibility" of irreparable harm in view of a strong case on the merits.

that is forced to arbitrate absent an agreement to arbitrate "would be irreparably harmed by being forced to spend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003); *see also PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 515 (3d Cir. 1990) *overruled on other grounds by Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002) ("[W]e think it obvious that the harm to a party would be per se irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority."); *McLaughlin Gormley King Co. v. Terminix Int'l Co., L.P.,* 105 F.3d 1192, 1194 (8th Cir. 1997) ("If a court has concluded that a dispute is non-arbitrable, prior cases uniformly hold that the party urging arbitration may be enjoined from pursuing what would now be a futile arbitration, even if the threatened irreparable injury to the other party is only the cost of defending the arbitration and having the court set aside any unfavorable award."); *Morgan Keegan & Co. v. Louise Silverman Tr.*, No. 11-cv-02533, 2012 WL 113400, at *5 (D. Md. Jan. 12, 2012), *aff'd sub nom.* 706 F.3d 562 (4th Cir. 2013); *Pension Plan for Pension Tr. Fund for Operating Engineers v. Weldway Const., Inc.*, 920 F.Supp.2d 1034, 1049 (N.D. Cal. 2013); *Starling v.*

*OnProcess Tech., Inc.*, No. 23-cv-10949, 2024 WL 1258501, at *9 (D. Mass. Mar. 25, 2024).

> As one court aptly put it:

> > [T]he injury to a party who is forced to submit to arbitration when it did not agree to do so constitutes per se irreparable harm[.] The rationale is that the party will be required to participate in discovery and resolution of a case in a forum lacking the substantive and procedural safeguards provided in our courts. Moreover, because court[s] will set [an arbitrator's] decision aside only in very unusual circumstances[,] forcing a party to submit to arbitration severely limits the scope of a court's review of that party's claims and defenses. Therefore, the time, energy, costs and fees associated with defending an unnecessary arbitration, as well as the potential cost of setting aside an unfavorable arbitration result, rise to the level of irreparable harm.

*Inception Mining, Inc. v. Danzig, Ltd.*, 312 F.Supp.3d 1271, 1285–86 (D. Utah 2018) (internal quotation marks omitted).

The irreparable harm is even more pronounced in this case because Vicor has, under Massachusetts law, an affirmative right to a stay of an arbitration where it has not agreed to arbitrate. *See* M.G.L. c. 251 § 2(b); *Societe Generale*, 643 F.2d at 864, n.1 (under Massachusetts law, the court "shall order a stay of arbitration" "if it finds that there is no agreement to arbitrate."). If a party is forced to arbitrate a claim to which it has not agreed to arbitrate, the right not to be compelled to arbitrate absent agreement, guaranteed by Massachusetts law, would be forever lost. Such is particularly the case here, where the Foxconn arbitrations threaten to

place a cloud over Vicor's intellectual property, the protection of which is central to Vicor's business strategy (A332), while providing few procedural safeguards against erroneous results.

Foxconn relies on two out-of-circuit cases for the proposition that being forced to arbitrate absent agreement does not cause irreparable harm. *See Trustmark Ins. Co. v. John Hancock Life Ins. Co.*, 631 F.3d 869 (7th Cir. 2011); C*ity of Meridian v. Algernon Blair, Inc.*, 721 F.2d 525, 529 (5th Cir. 1983). Both cases are distinguishable. In both cases the court concluded that a party that had obtained an injunction blocking arbitration had, in fact, agreed to arbitrate. This alone was a sufficient basis to vacate the injunction. *See Trustmark*, 631 F.3d at 872; *Meridian*, 721 F.2d at 528-529. These decisions therefore do not address the question, except in *dicta,* of whether a party that had not agreed to arbitrate is irreparably harmed by being forced to do so.

Furthermore, in neither case did the party seeking an injunction have **a statutory right not to be forced to arbitrate**, as Vicor does in this case. M.G.L. c. 251 § 2(b); *cf. Societe Generale*, 643 F.2d at 864 (affirming TRO against arbitration, under M.G.L. c. 251 § 2(b), without addressing irreparable harm).

### 3.    The Balance of Equities Favors an Injunction

The district court properly found that the balance of equities favors the issuance of an injunction, since an injunction would protect Vicor from being

forced to arbitrate before an arbitration body to which it did not agree and would avoid the prospects of inconsistent judgments between the Chinese arbitration panel and the U.S. courts. (Add.37). Conversely, there is nothing inequitable about preventing Foxconn from pursuing an arbitration to which Vicor never agreed.

### 4.     The Public Interest Favors an Injunction

The public interest will be served by preventing Foxconn from forcing Vicor into an unconsented-to arbitration. As this Court has observed, "arbitration is a matter of consent, not coercion." *Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 36 (1st Cir. 2017). The FAA's general policy favoring **voluntary** arbitration would not weigh against the injunction, where Vicor did not enter into a voluntary agreement with Foxconn to arbitrate. *See Morgan Keegan*, 2012 WL 113400, at *6 ("[F]orcing parties to arbitrate when they did not agree to arbitrate disincentivizes arbitration and lowers the public's confidence in arbitration as an avenue for dispute resolution.").

### B.     The District Court Correctly Concluded that Section 1659 Posed No Bar to Enjoining an Improper Arbitration

#### 1.     Even if Section 1659 applied to this case (it does not), the statute only requires a stay, and not vacatur—the injunction would remain in effect during the stay

Foxconn begins its argument with the assertion that this "appeal should begin and end with the text of § 1659(a)" and quotes the statute's requirement that

"the district court shall **stay**" proceedings subject to the statute.  (Foxconn Br. at 21).  The statute, as Foxconn recognizes, requires district courts take a single action upon request—the district court must **stay** applicable proceedings.  It does not require the district court to **vacate** prior rulings.

Thus, even if Section 1659 were to apply to this action (and it does not for the reasons explained in the next subsection), Foxconn cannot obtain the relief it seeks.  By the time Foxconn requested a stay, the district court had already issued an order enjoining Foxconn from "further pursuing the arbitrations against Vicor before CIETAC."  (V.Add.4).  That injunction, styled as a TRO, would have remained in effect even if the entire proceedings had been immediately stayed.  Foxconn argues that the TRO was limited by rule to 14 days.  (Foxconn Br. at 15, n.5).  That is incorrect.  Fed.R.Civ.P. 65(b)(2) imposes a time limit only on TROs issued "without notice."  The TRO here was issued **after notice** **and a hearing** and by its terms would expire upon "resolution of the pending motion for preliminary injunction."  (V.Add.4).  This Court has recognized that contested TROs may extend beyond the Rule 65 time limit, and those that do may be considered preliminary injunctions.  *State of Me. v. Fri,* 483 F.2d 439, 441 (1st Cir. 1973); *see also In re Criminal Complaint*, 329 F.3d 131, 137 (2d Cir. 2003) (TRO extended until preliminary injunction hearing does not expire based on Rule 65 time limits); *Levine v. Comcoa Ltd*., 70 F.3d 1191, 1193 (11th Cir. 1995); *H-D Michigan, LLC v.*

*Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 844 (7th Cir. 2012). Thus, the district court in effect simply replaced one preliminary injunction with another of equal scope. *Compare* V.Add.4 *with* Add.40 (injunctions have identical scope).

After the TRO issued, Foxconn had choices. Foxconn could have requested an expedited schedule leading to prompt resolution of Vicor's preliminary injunction motion. Had Foxconn prevailed, the TRO would have been lifted. Instead, Foxconn chose to invoke Section 1659, and urged the court to immediately stay all proceedings.

The flaw in Foxconn's gambit was that a stay would freeze the status quo and **would thereby leave the TRO in place**. A stay of proceedings does not vacate prior court orders. Rather, it suspends **further** court action. *See HealthproMed Found., Inc. v. Dep't of Health & Hum. Servs.*, 982 F.3d 15, 19 (1st Cir. 2020) (noting that an automatic stay of proceedings under PROMESA "does not change the Commonwealth's existing obligation to make wraparound payments under the 2010 preliminary injunction and prior district court orders."); *SEC v. Liberty*, No. 2:18-cv-00139-JDL, 2020 WL 4677292, at *1 (D. Me. Aug. 12, 2020) (prior orders of court survived stay of "all proceedings.").

Thus, even if Section 1659 had required a complete stay and precluded the district court from ruling on the preliminary injunction motion, the prior injunction (the TRO) would have remained in place leaving Foxconn in the exact position it is

now.  The TRO and preliminary injunction are identical in scope and thus Foxconn

cannot obtain the relief it seeks even if its view of the law were correct.

> **2.      Section 1659 only applies to parallel infringement actions—
> not to an action seeking to enjoin an improper arbitration**

The district court properly determined that Section 1659 did not prevent the

court from issuing a preliminary injunction.  However, in reaching that correct

conclusion, the district court first determined that Section 1659 "applies to this

case."  (Add.7).  That determination was incorrect because Section 1659, properly

understood, applies only to parallel enforcement actions that would require a

defendant to defend against allegations of wrongdoing in two fora simultaneously.

Thus, in addition to affirming the district court based on the district court's

reasoning, the PI Order may be upheld on the alternate ground that Section 1659

does not apply to this action at all—and therefore poses no bar to the district

court's injunction.

To properly construe Section 1659, we must begin with the statutory

language.  *Barnhart v. Sigmon Coal Co*., 534 U.S. 438, 450 (2002) ("As in all

statutory construction cases, we begin with the language of the statute.").  The

relevant portion of the statute states that the district court shall "at the request of a

party," stay "proceedings in the civil action with respect to **any claim that**

**involves the same issues** involved in the proceeding before the [ITC]." 35 U.S.C.

§ 1659(a).

The phrase "any claim that involves the same issues" is ambiguous. The word "same" generally means "identical" (the court may take judicial notice of the meaning of "same" as the Merriam-Webster online dictionary at https://www.merriam-webster.com/dictionary/same). Thus, under a straightforward reading, the statute would cover only claims with identical factual and legal issues (the literal meaning of the text). But such a reading would make no sense, since it would exclude the very scenario, parallel enforcement actions, that the statute was indisputably intended to cover, and indeed, would exclude all district court actions, since the issues are never identical to ITC cases.[19] Thus, further judicial construction is required.

A fundamental canon of statutory construction is that "the words of the statute must be read in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 492 (2015). This is because the "meaning—or ambiguity—of certain words or phrases may only become evident

---

[19] An ITC petitioner must show that it satisfies the "domestic industry" requirement of 19 U.S.C. § 1337, *see Zircon Corp. v. Int'l Trade Comm'n,* 101 F.4th 817, 821-822 (Fed. Cir. 2024), an issue not present in district court patent litigation. Conversely, district court plaintiffs generally seek to prove damages, which are not available before the ITC. *See New Balance Athletic Shoe, Inc. v. Converse, Inc.,* 86 F.Supp.3d 35, 37 (D. Mass. 2015).

when placed in context." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).

Section 1659 is a provision of the Uruguay Round Agreements Act (the "URAA"), which implemented aspects of the trade agreements that "produced the World Trade Organization (WTO) and the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS)." *Golan v. Holder*, 565 U.S. 302, 312–13, (2012); s*ee also* 19 U.S.C. § 3511.

One goal of those agreements was to provide an equal playing field among domestic and foreign producers (the "national treatment" rules).  Prior to the URAA, a domestic producer could simultaneously prosecute enforcement actions before the ITC and in district court.  But a foreign producer could not use the ITC to enforce IP rights against domestic goods.  That asymmetry was considered to conflict with the national treatment rules of the trade agreements.  (A703).  Therefore, the URAA included the stay provision of Section 1659 to address the conflict.  *Id.*  "§ 1659 was included … to address the possibility that **infringement proceedings** may be brought against imported goods in two forums at the same time."  *In re Princo Corp*, 478 F.3d 1345, 1355 (Fed. Cir. 2007) (internal quotations omitted).

Thus, when "read in their context and with a view to their place in the overall statutory scheme," *King*, 576 U.S. at 492, the intended meaning of the

words "claim having the same issues" becomes clear.  The phrase simply refers to a cause of action (claim) that relies on the same fundamental factual and legal allegations (issues) to establish liability.  The statute should thus apply, as intended, to parallel enforcement actions, such as patent infringement actions, in which the plaintiff seeks to enforce the same rights against the same alleged wrongdoing by the defendant at both the ITC and in district court.

Properly understood, Section 1659 does not require a district court to stay a case, such as this one, seeking to enjoin an unconsented-to arbitration merely because there is some factual or legal overlap with a defense raised in an ITC case.  Such a proceeding does not require a foreign producer or importer to defend itself against the same allegations of wrongdoing in two fora simultaneously, and thus does not involve the type of parallel "claim" that Section 1659 was intended to prevent.

Moreover, interpreting the statute so broadly would be contrary to the purpose and spirit of the URAA, and would lead to perverse results.  Under Foxconn's reading, an ITC respondent could plead as a defense that the patentee had entered into a broad agreement to arbitrate all disputes.  The same respondent could then block an unrelated district court action–*e.g.*, an effort by the patentee to collect an unrelated contractual debt–by asserting the same "arbitrate all disputes" defense, thereby creating an overlapping "issue" between the two cases.  The

district court would then have to stay the otherwise unrelated contract case during the pendency of the ITC case even if the arbitration defense was meritless. Contrary to the "level playing field" intent of the URAA, Foxconn's interpretation would actually give importers **more rights** than domestic producers by granting only to importers the ability to prevent district courts from enjoining bogus arbitrations.

Foxconn fails to cite a single case in which Section 1659 has been applied outside of a parallel enforcement action, and courts that have considered the question have concluded that it should not be.[20] *See Sandisk Corp. v. Phison Elecs. Corp.,* 538 F.Supp.2d 1060, 1065 (W.D. Wis. 2008) (noting that "statutory language and legislative history of § 1659 establish that a stay is required only when **parallel claims involve the same issues about the same patent**" and holding that the statute did not apply to a claim involving a related patent to those before the ITC even though there were many overlapping issues). Foxconn's "reading extends the mandatory stay beyond its purpose" because "the law was enacted to protect importers and producers from *identical* parallel claims." *Id.* (emphasis in original). Even *In re Princo,* the leading case cited by Foxconn, involved parallel enforcement actions asserting infringement of the same patent in

---

[20]Foxconn clearly understood that the statute only applied to parallel enforcement actions until the district court suggested otherwise. (January 19, 2024 Hearing Transcript at 80:21-81:2).

district court and the ITC.  486 F.3d 1365, 1368 & n.2 (Fed. Cir. 2007); *accord*

*Viking Therapeutics, Inc. v. Ascletis Bioscience Co*., No. 22-cv-02062, 2023 WL

6988403, at *3 (S.D. Cal. Apr. 3, 2023) (involving parallel cases enforcing trade

secrets against misappropriation).

### 3.     Even if applicable, Section 1659 did not prevent issuance of the preliminary injunction

The district court properly determined that Section 1659 "does not prevent

the Court from issuing temporary or preliminary injunctive relief aimed, as here,

at: preserving its jurisdiction; preventing potentially inconsistent judgments; and

protecting a party from participating in an arbitration to which, according to the

tentative determinations the court has made, it did not agree."  (Add.7).  While

Section 1659 states that a court "shall stay" a qualifying case "at the request of a

party," it does not preclude the issuance of ancillary orders at the time of entry of

the stay.[21]

Foxconn cites no authority, because there is none, holding that a district

court may not rule on a pending motion or issue injunctions **to preserve the status**

**quo** after determining that a stay is otherwise appropriate.[22]  To the contrary,

_____

[21] Unlike the statute at issue in *Miller v. French*, 530 U.S. 327, 337 (2000), Section 1659 does not state that the request itself "shall operate as a stay."

[22] Contrary to Foxconn's assertion (Br. at 23), *Fuji Photo Film Co., Ltd. v. Benun*, 463 F.3d 1252, 1255-56 (Fed. Cir. 2006) does not address this question.

multiple courts have concluded that they retained the power to issue injunctive orders or rule on pending motions despite a Section 1659 stay. *See Broadcom Corp. v. Qualcomm Inc.*, No. 05-cv-00468, 2005 WL 5925585, at *2-3 (C.D. Cal. Sept. 26, 2005) (lifting the mandatory stay in order to enjoin parties from proceeding with substantially similar claims elsewhere); *Microsoft Corp. v. Tivo, Inc.,* No. 11-cv-00134, 2011 WL 1930640, at *2 (W.D. Wash. May 19, 2011) (ruling on transfer motion).

*In re Princo*, 478 F.3d 1345 (Fed. Cir. 2007) is not to the contrary. In *Princo*, the issue was when an ITC determination becomes "final" within the meaning of Section 1659, which determines when a previously granted stay should be lifted. The district court had lifted the stay after the ITC decision, but before all appeals were exhausted. The Federal Circuit held that the case should have remained stayed through all appeals, and directed the district court to vacate its orders on the summary judgment motions which had been filed and ruled on after the stay had been improperly lifted. *Id.* at 1357. The *Princo* case did not involve motions already pending at the time a stay was requested and did not address a court's ability to issue injunctions to maintain the status quo or to preserve jurisdiction upon entering a stay under the statute.

Foxconn spends pages arguing that the district court improperly relied on the "All Writs Act" for its authority. But there is no dispute that the district court had

the power to issue injunctions to stop an arbitration.  *See Societe Generale*, 643

F.2d at 868.  Nor is there any dispute that the district court retained jurisdiction

over the case despite the stay.  *Cf. Cortez Byrd Chips, Inc. v. Bill Harbert*

*Construction Co.,* 529 U.S. 193, 202 (2000) (court retains jurisdiction despite

mandatory arbitration stay).  The question is thus whether Section 1659 should be

woodenly interpreted to prevent a court from using its equitable power to preserve

the status quo at the outset of a stay, and thus prevent irreparable harm while the

stay is in place.  For the reasons stated above, it should not.

### C.    Comity Is Not Implicated by the Preliminary Injunction

Foxconn relies extensively on caselaw relating to "international anti-suit

injunctions" to argue both that (a) the district court's PI Order is subject to an

intermediate level of scrutiny, rather than the usual abuse of discretion standard,

and (b) that the PI Order should have been subject to a rebuttable presumption

against its issuance.  Both conclusions are incorrect since the PI Order is not an

anti-suit injunction.  An "international anti-suit injunction" enjoins parties from

pursuing lawsuits in the courts of other sovereign countries.  *Quaak*, 361 F.3d at 17

("[A]n international antisuit injunction… effectively restricts the jurisdiction of a

foreign sovereign's courts.").  Here, the district court's injunction did not enjoin a

lawsuit in a foreign court.  Rather, it enjoined Foxconn from pursuing **private**

**arbitration** before CIETAC, a non-governmental entity that is part of the "China

51

Chamber of International Commerce." (A811; A210). Accordingly, the district court's injunction was not an "international anti-suit injunction," and it is subject neither to heightened scrutiny nor a presumption against its issuance.

Foxconn fails to cite a single case in which the doctrine of comity was applied to scrutinize, let alone reverse, an injunction against an arbitration proceeding. That is unsurprising, since "comity" concerns "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Quaak*, 361 F.3d at 18. Since the injunction against a private arbitration does not implicate the legislative, executive or judicial acts of another nation, comity has no application in this case. Here, the district court's injunction blocks Foxconn from pursuing private arbitrations purportedly authorized by a non-existent contract that Foxconn alleges was formed under the laws of Massachusetts. This is not a situation of concurrent jurisdiction involving a U.S. court and a foreign court, and thus there is no presumption against issuing an injunction.

Foxconn cites no authority denying an injunction against a never-agreed-to arbitration based on comity, merely because the alleged situs of the arbitration is in a foreign country, or because one of the parties resides outside the United States. The cases Foxconn does rely on do not compel a different result. For example, this case fundamentally differs from *Maroc Fruit Board S.A. v. M/V ALMEDA STAR*,

961 F.Supp.2d 362 (D. Mass. 2013). The defendants in *Maroc* instituted an arbitration in London, and the plaintiff feared that the defendants would go further and seek an *ex parte* order from an English **court** enjoining the U.S. case in favor of the UK arbitration. The court recognized that because the requested injunctive relief would interfere with a **foreign judicial proceeding**, considerations of international comity had to be given "substantial weight," and thus created a presumption again the issuance of the injunction, which it held was not rebutted. *Id.* at 365-66.[23] *See also General Elec. Co. v. Deutz AG*, 270 F.3d 144, 148-49 (3rd Cir. 2001) (applying comity to reverse an injunction against an action in the English **courts**); *Athina Investments Ltd. v. Pinchuk*, 443 F.Supp.2d 177, 179 (D. Mass. 2006) (applying comity in refusing to enjoin a parallel action brought in a Russian **court**[24]).

Foxconn's reliance on *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) is also misplaced. In *Mitsubishi*, the Supreme Court interpreted the FAA to permit enforcement of international agreements to arbitrate antitrust claims. *Id.* at 628-40. Comity was only a small part of a larger discussion

---

[23] While the *Maroc* court noted that the arbitration "alone does not threaten the court's jurisdiction," *id.,* there is nothing in *Maroc* suggesting that an injunction solely against an arbitration would have been subject to heightened scrutiny.

[24] The action was brought in the Russian *Arbitrazh* [Arbitration] Court which, despite its name, is a commercial **court** that is part of the Russian government. *See Parex Bank v. Russian Sav. Bank*, 116 F.Supp.2d 415, 424 (S.D.N.Y. 2000).

criticizing prior cases which had found antitrust disputes to be non-arbitrable. *Id.* at 632-38.  The Court ultimately concluded that there was no good reason not to enforce the parties' voluntary agreement to arbitrate, including that the arbitration was outside of the United States. *Id.* at 639-40. *Mitsubishi* has no bearing on this case, which does not involve any conflict between U.S. and foreign laws or policies.  To the contrary, Foxconn claims that the arbitration must go forward based on a contract allegedly formed under Massachusetts law, and it has cited no foreign law that would obligate Vicor to arbitrate.

Finally, even if it applied, the *Quaak* presumption against anti-suit injunctions should be overcome where, as here, there was never an agreement to arbitrate.  (V.Add.2; Add.26-Add.27). *Cf. Societe Generale*, 643 F.2d at 868.

# CONCLUSION

The Court should affirm the district court's order preliminary injunction order dated June 24, 2024.  In the alternative, if the Court determines that the Section 1659 stay precluded the district court from ruling on Vicor's preliminary injunction motion, the Court should reinstate the district court's temporary restraining order dated January 19, 2024.

Respectfully submitted,


Dated:  September 30, 2024                    */s/ Lawrence K. Kolodney*
                                             Lawrence K. Kolodney
                                             Fish & Richardson P.C.
                                             One Marina Park Drive
                                             Boston, MA  02210
                                             617-542-5070
                                             kolodney@fr.com

                                             Counsel for Plaintiff-Appellee
                                             VICOR CORPORATION

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,967 words, excluding the items exempted by Fed. R. App. P 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Dated: September 30, 2024            */s/ Lawrence K. Kolodney*
                                                       Lawrence K. Kolodney

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 30, 2024, I electronically filed the

foregoing document with the United States Court of Appeals for the First Circuit

by using the CM/ECF system. In addition, I certify that the following counsel were

caused to be served via email:

Russell E. Levine (rlevine@kirkland.com)
Philip Cooper (philip.cooper@kirkland.com)
Marcus E. Sernel (msernel@kirkland.com)
Tiffany Marie Knapp (tiffany.knapp@kirkland.com)

> _/s/ Lawrence K. Kolodney_____
> Lawrence K. Kolodney

# ADDENDUM

## TABLE OF CONTENTS - ADDENDUM

| Document | Page |
|---|---|
| Order on Plaintiff's Emergency Motion for Temporary Restraining Order (Jan. 19, 2024) (Docket No. 27) | V.Add.1 |
| Vicor's Standard Terms and Conditions (Docket No. 42) | V.Add.5 |
| Order No. 25 Denying Motion to Terminate the Investigation as to Certain Respondents Based on a Forum Selection Clause Requiring Arbitration (ITC Inv. No. 337-TA-1370, Jan. 23, 2024) (Docket No. 33-1) | V.Add.16 |
| Mass. G. L. ch. 251. § 2 | V.Add.22 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

                                          )
VICOR CORPORATION,                        )
                                          )
        Plaintiff,                        )
                                          )
v.                                        )        Civil No. 24-10060-LTS
                                          )
FII USA, INC. (a/k/a Foxconn Industrial   )
Internet USA, Inc.), INGRASYS             )
TECHNOLOGY INC., and INGRASYS             )
TECHNOLOGY USA INC.,                      )
                                          )
        Defendants.                       )
_____          )

ORDER ON PLAINTIFF'S EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER (DOC. NO. 8)

January 19, 2024

SOROKIN, J.

        Plaintiff Vicor Corporation filed this suit against Defendants FII USA, Inc., Ingrasys

Technology Inc., and Ingrasys Technology USA, Inc., seeking declaratory and injunctive relief.

Doc. No. 1. With its Complaint, Plaintiff filed a Motion for Preliminary Injunctive Relief, Doc.

No. 4, and shortly thereafter, a Motion for Temporary Restraining Order, Doc. No. 8. The Court

heard the Motion for a TRO on Friday, January 19, 2024, after expedited briefing submitted by

Plaintiff and the Defendants. Doc. No. 26.

        Plaintiff requests the Court enjoin Defendants from further pursuing an arbitration

initiated on or about January 11, 2024, before the China International Economic and Trade

Arbitration Commission ("CIETAC") in China on the grounds that Plaintiff's contract(s) with

Defendants contain no arbitration provision at all or, at most, provide for arbitration in Boston,

Massachusetts. See Doc. No. 8. The Court resolves this Motion by applying the familiar four-

part test for injunctive relief. See Orkin v. Albert, 557 F. Supp. 3d 252, 256 (D. Mass. 2021)

(finding test for TRO to be the same as that for a preliminary injunction); Coquico, Inc. v.

Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009) (stating four-part test for preliminary

injunction).

 Defendants sent Plaintiff various purchase orders of which most, but not all, included as a

term of the order, an agreement to arbitrate any disputes in China before CIETAC. See e.g., Doc.

No. 5-7 ¶ 16. There is no evidence before the Court that Plaintiff accepted these purchase orders.

Rather, Plaintiff responded with Sales Order Acknowledgements ("SOAs") which, by reference,

included Plaintiff's standard terms and conditions stating it "expressly conditioned" acceptance

on buyer's (here the Defendants) agreement to Plaintiff's terms and conditions and no other

terms and conditions. See Doc. No. 5-8 at 3; Doc. No. 5-6 ¶¶ 1-2.  This response was a

counteroffer under § 2-207 of Massachusetts version of this standard UCC Provision. Mass. Gen.

Laws ch. 106 § 2-207 (2023); see also U.C.C. § 2-207 (Am. L. Inst. & Unif. L. Comm'n 1977).

Nothing in the record indicates that any Defendant rejected the counteroffer. The parties agree

Plaintiff ultimately shipped the products ordered and Defendants paid for the products. In these

circumstances, either Plaintiff's terms and conditions constitute the contract, or the parties

formed a contract by their conduct, supplemented by the UCC and any terms upon which their

competing forms agree. See Mass. Gen. Laws ch. 106 § 2-207(3) (2023). At this early stage, the

Court need not resolve that question.

 A contract to arbitrate in the United States vests primary jurisdiction over arbitration-

related matters requiring judicial resolution with the United States District Courts. URS Corp. v.

Lebanese Co. for the Dev. and Reconstruction of Beirut Cent. Dist. SAL, 512 F. Supp. 2d 199,

209 (S.D.N.Y. 2007) (ruling that courts in the location of the agreed upon arbitration possess

V.Add.2

"primary jurisdiction" over the proceedings). Alternatively, in the absence of a written contract, the Court possess authority to enforce Plaintiff's rights to declaratory relief enforcing those contractual provisions that do exist, and, in this diversity case, to enjoin the parties before it from pursuing an arbitration not founded in contract.[1] Mass. Gen. Laws ch. 251 § 2(b) (2023). For these reasons, the Court finds Plaintiff has established a likelihood of success.

Plaintiff faces irreparable harm from having to proceed to arbitrate overseas when the contract between the parties either provides for arbitration in the United States or not at all and, in any event, does not provide for arbitration before CIETAC. See UBS Securities, LLC v. Voegli, 405 F. Appx. 550, 552 (2d Cir. 2011) (citing Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003)). This is particularly so when the failure to appear in the arbitration proceeding before CIETAC results in a default award. Here the stakes are high as the Defendants assert their purchase orders not only require arbitration, but give rise to a license to use Plaintiff's intellectual property beyond just using the particular products purchased. Doc. No. 20 at 6.

For these reasons, the absence of countervailing considerations in the form of meaningful prejudice, and to preserve the Court's power to resolve more fully all of the issues in dispute to the extent warranted, the Court finds that the other prerequisites to the TRO satisfied. Several further points bear mention. First, the Court does not consider the implications of 28 U.S.C. § 1659 raised by Defendants for the first time at the hearing. Defendants can file a motion under that statute if warranted. Second, the Court's rulings are necessarily temporary and subject to

---

[1] In this latter scenario without a written contract, defense counsel suggests that the contract would include an agreement to arbitrate although without a provision as to whom arbitrates, e.g., CIETAC or AAA, perhaps requiring judicial resolution of that question. Doc. No. 26. In these circumstances, there is no agreement to arbitrate before CIETAC which is the dispositive issue on the TRO.

revision upon a more developed record, as well as arguments developed for a hearing on a

motion for the pending preliminary injunction. See Doc. No. 4.

**Accordingly, the Court hereby enters the following Temporary Restraining Order. The Court ENJOINS each defendant as well as its agents, officers, and employees from further pursuing the arbitrations against Vicor before CIETAC that one or more of them have initiated. Each defendant shall seek a stay of the arbitrations that they have initiated against Vicor at the CIETAC pending resolution of the motion for preliminary injunctive relief. This Temporary Restraining Order shall expire upon this Court's resolution of the pending motion for a preliminary injunction.**

Defense counsel shall provide a copy of the foregoing Temporary Restraining Order to

each Defendant and the appropriate officer(s) within each Defendant. No later than close of

business Wednesday, January 24, 2024, the parties shall file a joint status report reporting than

joint or separate positions for a prompt schedule to govern the pending motion for a preliminary

injunction, as well as any other motions any party anticipates filing.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

4

V.Add.4

# Terms and conditions of sale

## 1. Scope

These Terms and Conditions of Sale ("Terms") shall be the sole terms and conditions governing the sale of products and services ("Goods") by Vicor Corporation or any of its subsidiaries, divisions, affiliates, or related entities based in the United States ("Vicor") to the commercial party listed on the order form or other documentation ("Purchase Order") provided to Vicor by that party ("Buyer"), except to the extent these Terms conflict with those of an existing, separate contract signed by Vicor and Buyer may take precedence over these Terms.[1] Vicor's express acceptance of a Purchase Order under these Terms is evidenced by its delivery of a Sales Order Acknowledgement ("SOA"), and such acceptance of a Purchase Order is expressly conditioned on Buyer's assent to these Terms, as described in Section 2. Only upon delivery by Vicor of a SOA to Buyer shall these Terms and the associated Purchase Order together become a binding, bilateral contract between Vicor and Buyer, with enforceable rights and performance obligations (the "Sales Agreement"). A Sales Agreement will not exist, and Vicor will not be obligated to fulfill a Purchase Order, unless Vicor affirmatively acknowledges the respective responsibilities of Vicor and Buyer through delivery of a SOA to Buyer. No party has been authorized by Vicor to make any statement or representation as to the sale of Goods inconsistent with these Terms, and no such statements, if made, will be binding upon Vicor or be grounds for any claim.

The Sales Agreement shall not fail as a contract due to the presence of conflicting terms and conditions of purchase of the Buyer set forth in Buyer's Purchase Order, as any and all such terms and conditions, including but not limited to provisions of purchase accompanying a Purchase Order, are hereby rejected and shall be of no effect. In the event of any conflict between these Terms and terms and conditions of purchase of the Buyer, these Terms shall prevail, except in those circumstances when Vicor has expressly consented to the specific application of the conflicting condition(s) of Buyer to the Sales Agreement, as specifically indicated in the SOA. If, subsequent to the issuance of a SOA, Vicor agrees to modify these Terms, Vicor's express consent will be valid and binding upon Vicor only when an amendment to the SOA is executed, as set forth in Section 3 below.

The products that are the subject of a sale by Vicor to Buyer are referred to as the "Products," and the services sold by Vicor to Buyer are referred to as the "Services." Vicor's SOA will explicitly set forth the identifying part numbers, quantities, unit prices, and scheduled shipment dates for Products associated with the Sales Agreement. Similarly, a SOA will explicitly set forth a Statement of Work ("SOW") describing the Services, if any, to be rendered, including progress milestone(s) and/or deliverable(s) associated with the Services (and the schedule(s) therefor, including the scheduling of payment of consideration and reimbursement of expenses) and any variance from these Terms necessitated by the nature and scope of the Services. To the extent any provisions set forth in the SOW conflict with these Terms, such provisions of the SOW shall have precedence solely in their application to Services.

These Terms, together with Vicor's Terms of Website Use and Vicor's Privacy Policy, apply to Buyer's access to and use of Vicor's website and the purchase of Goods using the online ordering functions of that website. By ordering Goods from the Vicor website, Buyer acknowledges having read, understood, and agreeing to be bound by these Terms and the two documents referenced in this paragraph.

## 2. Buyer's express acceptance of these terms

Buyer's assent to these Terms shall be conclusively presumed from: (A) Buyer's receipt of Vicor's SOA without written objection received by Vicor within 10 days after such receipt; (B) Buyer's instruction to Vicor to begin manufacturing (and/or shipping) the Products and/or delivering the Services after receipt of Vicor's SOA; (C) Buyer's acceptance of or payment for all or any part of the Products or Services set forth in the SOA; or (D) taking any other action evidencing Buyer's acceptance of the benefits of the Sales Agreement between Vicor and Buyer. Based on such presumption, Vicor may commence performance in reliance upon Buyer's assent to these Terms.

### 3. Entire agreement; modification

These Terms, together with Buyer's Purchase Order (inclusive of all specifications, drawings, and data submitted to Vicor with such Purchase Order) and Vicor's SOA (inclusive of a SOW for Services, if any), shall constitute the complete and final Sales Agreement between Vicor and Buyer, superseding completely any prior oral or written communications. In the event a modification of the Sales Agreement is required due to subsequent changes in circumstance, the specific changes to these Terms or the provisions related to quantities, specifications, shipping arrangements, or other related variables shall be memorialized in the form of a letter agreement representing an amendment to a referenced SOA and attached thereto; provided, however, such letter agreement shall be effective and binding upon Vicor only if it is signed by an authorized Vicor representative.

### 4. Prices; taxes and related costs

All prices for Goods are invoiced and payable in U.S. Dollars. Prices set forth in the SOA for specifically scheduled Product unit quantities will be effective for 12 months after the date of that SOA. Notwithstanding the preceding sentence, in the event the SOA sets forth a unit price reflecting a discount based on the Buyer's commitment to purchase a defined quantity of units during the 12 months after the date of the SOA, and the Buyer does not meet this commitment, Vicor will invoice Buyer, at the conclusion of the 12 month period, an additional amount representing the difference between (A) the value of the quantity actually purchased by the Buyer at the unit price set forth in the SOA and (B) the value of the quantity actually purchased by the Buyer at a unit price reflecting the volume pricing schedule in effect at the date of the SOA. Such invoiced amount will be in addition to any charges associated with cancellation of the Sales Agreement, as provided for in Section 9.

Prices do not include applicable taxes (federal, state, municipal, or other government sales, use, excise, or similar transactional taxes) or import costs (tariffs, duties, customs charges, or similar fees), the payment of which shall be the sole responsibility of Buyer, regardless of whether Buyer is invoiced by Vicor for such taxes or import costs. Vicor's invoice will set forth the amounts of any such taxes, import costs, or related charges subject to collection from Buyer upon sale or delivery of the Goods as reimbursement to Vicor for payment of such charges on behalf of Buyer. Buyer, at its own expense, shall be responsible for delivery of a certificate of exemption (or similar document) required to exempt the sale or importation of Goods from any taxes, import costs, or other charges.

### 5. Shipment; carriage

Vicor will ship Products "Ex Works" Vicor's facility (EXW; as defined and governed by ICC Incoterms 2000), freight prepaid or freight collect to destination. Buyer must pay all transportation costs associated with delivery of Products. Unless specific instructions to the contrary are supplied by Buyer, Vicor will select the carriage and carrier to ship Products to the Buyer's address set forth in the Purchase Order and confirmed in the SOA. Vicor will not assume any liability in connection with the shipment of Products, nor will Vicor designate any carrier as its agent. Buyer shall indemnify and hold harmless Vicor from and against any claims, damages, or liabilities suffered by Vicor resulting from any acts or omissions of carrier.

### 6. Title to products; risk of loss

Title to the Products and all risk of loss to those Products pass to Buyer at the point of EXW shipment from Vicor's facility, whether freight prepaid or freight collect to destination, regardless of whether Buyer elects to choose a carrier and schedule shipments. Any special tools, dies, or fixtures developed by Vicor to manufacture the Products or deliver the Services are Vicor's property.

Buyer must obtain adequate insurance to cover the Products from the time title has passed from Vicor to Buyer. Risk of loss for damage or delay in transit shall be born solely by Buyer. Buyer shall file and pursue any claims directly with the carrier related to loss, damage, or delay in transit, and Buyer shall not assert such claims against Vicor or deduct from amounts owed to Vicor.

## 7. Delivery

Delivery dates set forth in the SOA are approximate; Vicor will use reasonable efforts to meet a delivery date or dates set forth in the SOA, but Buyer acknowledges (A) Vicor is not bound by any such date(s) set forth in the SOA, and (B) Vicor's failure to meet such date(s) will not constitute a breach of the Sales Agreement. In no event will Vicor be liable for any claims for labor or for any special, indirect, incidental, or consequential damages including, but not limited to, costs of shipment, demurrage charges, lost sales, operational downtime, lost profits (whether direct or indirect), or any other damages resulting from delivery delay. Acceptance by Buyer of the Product(s) upon delivery of a specific shipment will constitute a waiver by Buyer of any claim for damages associated with Vicor's failure to meet the delivery date set forth in the SOA for such shipment.

Vicor reserves the right to deliver to Buyer in installments, based on current and forecast Product availability. Vicor also reserves the right, in the event of production constraints, to allocate product deliveries among its customers. Vicor, as soon as practicable after its determination of the need to deliver in installments or to allocate product deliveries among customers, will notify Buyer and amend the SOA, pursuant to Section 3, to reflect a revised shipment schedule.

Vicor may postpone a delivery date in the event Buyer has not met its payment obligations under these Terms. In the event Buyer refuses to accept delivery of any Products, such Products will be held by Vicor awaiting Buyer's instructions for 20 days, after which Vicor may deem the shipment as abandoned and dispose of the Products as it sees fit, without crediting Buyer's balance due to Vicor.

## 8. Force Majeure

Vicor will not be liable for any loss or damage of Buyer resulting from any delay in delivery or failure to give notice of delay when such delay is due to any cause or event beyond Vicor's control, including, without limitation, acts of nature, extreme weather, fires, pandemics, wars, civil disturbance, acts of terrorism, sabotage, unavailability of supplies or sources of energy, strikes or labor difficulties, delays in transportation, delays in delivery or defaults by Vicor's vendors, governmental actions and prohibitions (including, without limitation, the imposition of boycotts, economic sanctions, embargos, export controls, and other restrictive trade measures), or acts or omissions of the Buyer. In the event of delay due to any such cause, the delivery date(s) shall be extended for a period of time equal to the duration of such delay, and the Buyer shall not be entitled to refuse delivery or otherwise be relieved of any obligations hereunder as a result of the delay.

## 9. Delays and cancellations by buyer

Buyer is not entitled to delay or cancel all or any part of a shipment of Products under a Sales Agreement, unless Buyer has received Vicor's prior, express written consent in the form of an amendment to the SOA in question pursuant to Section 3. Such consent may be withheld or conditioned in Vicor's sole discretion. Buyer must provide written notice to Vicor of its request of such delay or cancellation prior to the following dates: for standard module and configurable Products, 60 days before the scheduled shipment date shown on the SOA; for custom Products, 90 days before the scheduled shipment date shown on the SOA; and, for all other Products, 120 days before the scheduled shipment date shown on the SOA. If the SOA is not amended to reflect Vicor's consent to rescheduled Product shipment(s) or the cancellation of the Sales Order, Vicor will ship all completed Products as originally scheduled. In the event Buyer requests delivery date(s) set forth in the SOA be delayed by 90 days or more, Vicor, in its sole discretion, may deem such request a cancellation. In the event of a breach of the Sales Agreement by Buyer, Vicor may cancel the Sales Agreement upon 10 days prior written notice to Buyer of such cancellation.

In the event of any cancellation of a Sales Agreement, Vicor will invoice Buyer and Buyer will pay Vicor for the documented costs incurred (or to be incurred) by Vicor, including: (A) the price for any Products manufactured under the Sales Agreement but not yet shipped; (B) the cost of any work-in-process associated with the Sales Agreement; (C) the cost of non-fungible materials and components ordered specifically to meet the manufacturing and delivery schedules of the Sales Agreement; and (D) other costs arising as a consequence of the cancellation, including, but not limited to, supplier restocking charges and related logistics costs.

## 10. Payment; invoicing

Terms are cash in full settlement of invoiced amount upon transfer of title of Goods, except: (A) in those circumstances when payment is received by Vicor concurrent with Vicor's issuance of a SOA (e.g., when Buyer places a partial or full deposit with Vicor to be applied toward the purchase, or when Buyer purchases Products utilizing the online ordering functions of Vicor's website); (B) when Vicor has extended trade credit to Buyer, in which case terms of payment are net 30 days from the date of invoice; or (C) the SOW associated with Services sets forth a specific schedule for amounts and timing of invoices and payments. Vicor may require Buyer's payment to be secured by an irrevocable letter of credit or a bank guarantee acceptable to Vicor; in such circumstances, all bank charges and collection costs shall be the responsibility of Buyer.

Vicor will invoice Buyer for amounts due upon shipment of Products; if such shipments are authorized in installments, each such shipment shall be considered a distinct transaction under the Sales Agreement, with each invoice paid by Buyer when due, without regard to other scheduled shipments. Vicor will invoice Buyer for Services provided at the time agreed upon in the SOA, consistent with the definition of the Services, the scheduling thereof, and the criteria for acceptance of the Services by Buyer, as set forth in the SOW.

In the event of Buyer's default in the payment of invoiced amounts due or, if Buyer becomes the subject of a bankruptcy or other insolvency proceeding, Vicor, at its option, without prejudice to any other of Vicor's lawful remedies, may cancel the Sales Agreement or delay deliveries thereunder. Buyer agrees to pay all costs, including, but not limited to, reasonable attorney and accounting fees and other expenses of collection, resulting from any default by Buyer under the Sales Agreement. Invoices remaining unpaid after their due date will be subject to a daily financing charge representing 12.0% per annum (or the maximum rate allowed by applicable law).

Amounts owed by the Buyer with respect to which there is no dispute shall be paid without set-off for any amounts that the Buyer may claim are owed by Vicor.

## 11. Trade credit

Vicor reserves the right to deny, limit, or cancel any amount of trade credit it may extend to Buyer. Vicor further reserves the right to require, as a condition of its performance, a deposit from Buyer of up to 100% of the purchase price set forth in the SOA, either at the time of the SOA issuance or at any time prior to Vicor's performance under the Sales Agreement.

If for any reason, Vicor, in its sole discretion, determines the ultimate collectability of amounts due from Buyer under the Sales Agreement to be in doubt, Vicor, without notice to Buyer, may delay delivery of the Goods and may require partial or full payment in advance in the form of a deposit, with respect to the undelivered balance of Goods subject to the Sales Agreement.

## 12. Standard specifications

Unless otherwise agreed as set forth in the SOA, as amended, Vicor will manufacture Products in accord with its own material and quality requirements, and performance specifications for the Products will be as set forth in Vicor's published datasheets for such Products (the "Standard Specifications"). Use of Buyer's part number in any documents evidencing the Sales Agreement or on the Products is for convenience only and does not constitute any representation by Vicor with respect to performance, specifications, or fitness of any part for any purpose. If Buyer requests modification of a Standard Specification in its Purchase Order, Vicor's consent to such modification will be evidenced by its acknowledgement and acceptance of such modification in the SOA, as amended. If any performance specification for a Product set forth in the SOA, as amended, differs materially from such specification requested by Buyer in its Purchase Order, Vicor may, in its sole discretion, require, as a condition of Vicor's performance, that Buyer provide its acknowledgment and acceptance of the performance specification set forth by Vicor, with such acknowledgment and acceptance representing an amendment of the SOA under the provisions of Section 3. A modification to a Product's Standard Specifications acknowledged and accepted by Vicor, as evidenced in the SOA, as amended, will be considered to be included in the Standard Specifications to which Vicor's Express Limited Warranty will be applicable.

13. Packaging

Vicor will endeavor to comply with Buyer's packaging specifications, if any, but Vicor reserves the right to substitute any other methods of packaging reasonably comparable to the specifications identified by Buyer in its Purchase Order. Vicor also reserves the right to modify packaging in a manner necessary to comply with customs, import, or other regulatory requirements in the jurisdiction(s) where the goods will be shipped.

14. Express limited product warranty

Vicor warrants each Product sold under these Terms to be free of defects in materials or workmanship and to conform to its respective Standard Specifications, as defined in the SOA, as amended (the "Express Limited Product Warranty"). The Express Limited Product Warranty commences upon the EXW shipment of Products to Buyer and is extended for the one, two, or three year periods applicable to the specific Product; such "Warranty Periods" are set forth on the Warranty Period webpage of the Vicor U.S. website.   The Express Limited Product Warranty is extended to Buyer and is not transferable; provided, however, if Buyer is a Vicor-authorized reseller or distributor and has reported to Vicor the identity of its customer and the Product in question, the Express Limited Product Warranty will be extended to the Buyer's customer for that Product. VICOR'S LIABILITY UNDER THIS EXPRESS LIMITED PRODUCT WARRANTY SHALL BE LIMITED TO EITHER: (A) THE OBLIGATION TO REPAIR OR REPLACE, AT VICOR'S SOLE DISCRETION, ONLY THOSE PRODUCTS PROVEN TO HAVE FAILED TO MEET IN MATERIAL RESPECT THE PERFORMANCE SPECIFICATIONS SET FORTH IN THE ASSOCIATED SOA, AS AMENDED, OR (B) REPAYMENT OF OR CREDIT AGAINST THE PURCHASE PRICE OF THOSE PRODUCTS. VICOR AND BUYER EXPRESSLY AGREE TO THE LIMITATION OF VICOR'S LIABILITY UNDER THE EXPRESS LIMITED PRODUCT WARRANTY TO THE VALUE REPRESENTED BY THE PURCHASE PRICE PAID BY BUYER. THIS LIABILITY LIMITATION AND DISCLAIMER WILL APPLY EVEN IF THE EXCLUSIVE REMEDY DESCRIBED IN THIS SECTION FAILS ITS ESSENTIAL PURPOSE.

15. Conditions of applicability of express limited product warranty

The Express Limited Product Warranty is of no effect if Products are not stored, handled, or serviced appropriately after the EXW shipment of the Products, or the non-conformity of the Products: (A) resulted from damages occurring after the EXW shipment of the Products, whether by misuse, accident, or improper application or maintenance; (B) was not reported in writing to, and acknowledged by, Vicor within two years of the EXW shipment of the Products; or (C) should have been discovered by Buyer in Buyer's inspection upon delivery and was not reported in writing to, and acknowledged by, Vicor within 10 days of such inspection. If Buyer (or the purchaser of Product subject to the extension of the Express Limited Product Warranty as provided for in Section 14) alters or modifies Product without Vicor's prior express written consent, in the form of a letter agreement representing an amendment of the SOA under the provisions of Section 3, and any claims are asserted against Vicor by reason of such alteration or modification, Buyer (or the purchaser of Product subject to the extension of the Express Limited Product Warranty as provided for in Section 14) shall defend, indemnify, and hold Vicor harmless against any and all damages, liabilities, expenses, and costs in connection therewith or resulting therefrom.

16. Non-conforming products; return authorization

If Buyer (the definition of which includes, for purposes of this Section 16, the purchaser of Product subject to the extension of the Express Limited Product Warranty as provided for in Section 14) believes the Product is in breach of the Express Limited Product Warranty, and the Express Limited Product Warranty is not rendered ineffective by Section 15, Buyer will notify Vicor promptly in writing, and Vicor will acknowledge such notification as soon as practicable. To assert a claim under the Express Limited Product Warranty, Buyer must (A) return to Vicor, within 10 days of Vicor's request, all Product believed to be non-conforming or, if acceptable to Vicor, in its sole discretion, a statistically relevant percentage thereof, and (B) provide to Vicor reasonable documentation supporting the claim as might be requested by Vicor, including, but not limited to, results of diagnostic tests, evaluations, and investigations performed by Buyer. Product subject to a claim under the Express Limited Product Warranty, if not returned to Vicor by Buyer, may not be repaired or discarded without Vicor's prior written consent, in the form of a letter agreement signed by an authorized Vicor representative. If Vicor confirms Product is in breach of the Express Limited Product Warranty, then Vicor, at its sole discretion and at no cost to Buyer, will repair or replace the non-conforming Product subject to the claim. Except as provided in this Section 16, SUCH REPAIR OR REPLACEMENT IS THE ONLY REMEDY AVAILABLE FOR ANY BREACH OF THE

EXPRESS LIMITED PRODUCT WARRANTY. Any Product repaired or replaced will be warranted by Vicor for 30 days from shipment or the remainder of the Product's original Warranty Period, whichever is longer. For repair or replacement under the Express Limited Product Warranty, Buyer must contact Vicor to obtain a return material authorization ("RMA") number and shipping instructions. If Buyer returns Product to Vicor without an RMA number, such Product will be held by Vicor for 20 days, after which Vicor may deem the Product abandoned and appropriate for disposal, without crediting Buyer's account. For Product returned with a valid RMA number, absent any contrary written instructions from the Buyer, such Product will be held by Vicor for 20 days after completion of Vicor's testing and analysis, after which such Product will be deemed abandoned and appropriate for disposal, without crediting Buyer's account. Vicor reserves the right to verify any claim of Product non-conformity to Standard Specifications at the module or sub-assembly level. If Buyer so requests for a non-conforming Product during that Product's Warranty Period, Vicor, at its sole discretion, may perform a destructive physical analysis of such Product, provided Buyer compensates Vicor for the costs of such analysis, subject to a minimum amount of $250 per unit.

## 17. Express limited service warranty

Vicor warrants it will maintain the necessary personnel, capabilities, and resources to provide the Services described in a SOW accompanying a SOA and such Services will be performed in accordance with standards of care and diligence generally practiced in the delivery of services of a similar nature (the "Express Limited Services Warranty"). Buyer agrees (A) the quality of Services shall be judged solely as to whether Vicor performed the Services consistent with the SOW and with the aforementioned standards of care and diligence and (B) Buyer's sole remedy in the event of its claim of a breach of the Express Limited Services Warranty is the agreement of Vicor, in its own discretion, to again perform, at no cost to Buyer, that portion (or those portions) of the Services associated with such claim. Notwithstanding the prior sentence or any provision herein to the contrary, Vicor expressly disclaims the applicability of all other express or implied warranties with respect to the performance of Services. VICOR AND BUYER EXPRESSLY AGREE TO THE LIMITATION OF VICOR'S LIABILITY UNDER THE EXPRESS LIMITED SEVICE WARRANTY TO THE VALUE REPRESENTED BY THE PURCHASE PRICE PAID BY BUYER FOR SUCH SERVICES. THIS LIABILITY LIMITATION AND DISCLAIMER WILL APPLY EVEN IF THE EXCLUSIVE REMEDY DESCRIBED IN THIS SECTION FAILS ITS ESSENTIAL PURPOSE.

## 18. No warranty for technical support

Vicor assumes no obligation or liability for any technical support provided to Buyer, including, but not limited to, advice with respect to the use of Product, all such advice being given and accepted at Buyer's sole risk, without consideration therefor. Vicor will not be liable for any damages of any kind arising out of or relating to the use of or the inability to use the technical support provided.

## 19. Warranty disclaimer and liability limitation

EXCEPT AS EXPRESSLY SET FORTH HEREIN OR EXPRESSLY STATED IN THE SOA, AS AMENDED, VICOR DISCLAIMS ALL OTHER WARRANTIES OR REPRESENTATIONS OF ANY KIND (WHETHER ARISING BY IMPLICATION OR BY OPERATION OF LAW) WITH RESPECT TO THE PRODUCTS AND SERVICES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OR REPRESENTATIONS AS TO MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE, OR ANY OTHER MATTER. THIS DISCLAIMER SURVIVES THE TERMINATION OF THE SALES AGREEMENT OR THE CANCELLATION OF ANY SHIPMENTS THEREUNDER. IN NO EVENT IS VICOR RESPONSIBLE TO BUYER FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, ALL DIRECT AND INDIRECT LOSSES (INCLUDING LOST PROFITS AND ANY OTHER FORM OF ECONOMIC LOSS) ASSOCIATED WITH THE SALE OF GOODS, REGARDLESS OF WHETHER THOSE DAMAGES WERE FORESEEABLE. THE LIABILITY OF VICOR ARISING OUT OF OR RELATING TO SALE OF GOODS SHALL BE LIMITED TO THE ACTUAL AMOUNTS PAID BY BUYER TO VICOR FOR THE PRODUCTS OR SERVICES, RESPECTIVELY, GIVING RISE TO SUCH DAMAGES.

## 20. Product use

Buyer (the definition of which includes, for purposes of this Section 20, the purchaser of Product subject to the extension of the Express Limited Product Warranty as provided for in Section 14) agrees Vicor's performance under a Sales Agreement is contingent upon Buyer's communication to Vicor of the application in which the Products will be used. Unless otherwise agreed to by Vicor in the SOA, as amended, Buyer agrees Products are not intended for and will

not be used in applications in which application failure could lead to loss of life or catastrophic damage to property and the environment. Product use in applications associated with human life support and nuclear power generation are expressly prohibited by Vicor, and Buyer will indemnify and hold Vicor harmless from any losses, costs, or damages resulting from Buyer's use of Products in such prohibited applications.

## 21. Product returns

Any Buyer request for the return of a Product to Vicor, for any reason, must be made in writing, and such a return will not be accepted unless it has been approved by an authorized Vicor representative, in writing, at the time of the issuance by Vicor of a RMA number. Vicor, in its sole discretion, may accept or reject any such return request by Buyer and reserves the right to impose charges on Buyer in connection with such return request.

## 22. Facility inspection

Facility inspection by Buyer, Buyer's agent, or Buyer's customer must be stipulated in Buyer's Purchase Order, and Vicor, in its sole discretion, may require reimbursement from Buyer for reasonable costs incurred to accommodate such inspection. Buyer shall have no right of access to any Vicor facility, except as specifically authorized in advance by Vicor in the SOA. Vicor makes no representations regarding its ability to facilitate access to any facilities operated by third party providers to Vicor of contract manufacturing services. Buyer will indemnify and hold Vicor harmless from any and all suits, damages, and expenses of Buyer, Buyer's agent, or Buyer's customer, resulting from death, personal injury, or loss of or damage to property occurring during, or in connection with, any facility inspection.

## 23. Government contracts

If Buyer is purchasing Goods for fulfillment of a United States government contract or a sub-contract of any tier under a United States government contract, Buyer shall promptly notify Vicor of that fact and of any contractual terms applicable to Vicor under the "flow-down" provisions of the United States Federal Acquisition Regulations ("FAR") or Defense Acquisition Regulations System ("DFARS"). Vicor will accept only those FAR or DFARS procurement provisions explicitly required under the regulations themselves, which will become binding and effective on Vicor only upon inclusion in the associated SOA, as amended. Vicor retains proprietary rights to Product designs and all technical data provided under such government contract. Neither the United States government nor any higher-tier contractor under a United States government contract receives any rights to Product design and/or technical data beyond the rights provided to all commercial customers under these Terms, except that Vicor grants to the United States government the minimum additional rights required under the narrowest applicable provisions of FAR or DFARS. Except as specifically agreed in writing, Vicor will not provide certified cost and pricing data and, accordingly, does not accept any Cost Accounting Standards, defective pricing, or audit requirements.

## 24. Export control

Buyer acknowledges and agrees the Goods being sold hereunder are subject to export control and economic sanctions laws, including, but not limited to, the U.S. Export Administration Regulations ("EAR"), the U.S. State Department's International Traffic in Arms Regulations ("ITAR"), the various economic sanctions programs administered by the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") and U.S. State Department, various laws of similar effect in the United Kingdom, European Union ("EU") and/or any of its member states, and other jurisdictions where Buyer operates. Buyer will not, without prior government authorization, export, re-export, or transfer any Goods, either directly or indirectly, to any country subject to any applicable export controls, economic sanctions, or to any resident or citizen of any embargoed or sanctioned countries wherever located, or to any other person, organization, or entity on any of the various restricted parties lists maintained by the U.S. Departments of Commerce, State, or Treasury, or agencies with similar jurisdiction in the EU and United Kingdom. In addition, any Products sold hereunder may not be exported, re-exported, or transferred to any end-user engaged in activities, or for any end-use, directly or indirectly related to the design, development, production, use, or stockpiling of weapons of mass destruction (e.g., atomic, biological, or chemical weapons, and the missile technology to deliver such weapons).

## 25. Intellectual property

Nothing in the Sales Agreement is to be construed as a grant or assignment of any license or other right to Buyer of any of Vicor's intellectual property rights, whether patent, trademark, trade secret, copyright or otherwise. All improvements and developments related to the Products or the efforts of Vicor and Buyer will be owned exclusively by Vicor, and Buyer shall reasonably cooperate with Vicor in confirming that result.

## 26. Confidentiality

Prices and related commercial information set forth in a Sales Agreement are hereby deemed proprietary to Vicor, and Buyer agrees to hold such proprietary information in confidence, to use such proprietary information solely in association with a Sales Agreement, and to not disclose such proprietary information to third parties without the express written consent in letter agreement form, signed by an authorized Vicor representative. Buyer shall be liable for any loss to Vicor or commercial gain by others from unauthorized use of such proprietary information occasioned by Buyer's failure to hold such proprietary information in confidence.

## 27. Indemnification by buyer

Buyer agrees to indemnify, defend, and hold harmless Vicor, its Board of Directors, corporate officers, employees, authorized distributors and representatives, and any successors or assignees from and against any and all damages, losses, expenses, costs (including without limitation reasonable attorney's and accountant's fees), claims, suits, actions, judgments, or other liability asserted against or incurred by Vicor arising out of: (A) Buyer's breach of its obligations under the Sales Agreement; (B) Buyer's negligence or misconduct with regard to the use, ownership, maintenance, transfer, transportation, or disposal of Product; (C) Buyer's misuse or misapplication of the Goods or damage to the Goods caused by Buyer or its employees, agents, or customers; (D) any infringements or alleged infringement of the intellectual property rights of others arising from Buyer's use of Product outside of Standard Specifications (including application of Buyer's trademarks and brand names to Product); and (E) Buyer's violation or alleged violation of any Federal, state, county, or local laws or statutes, including without limitation, those governing product safety, labeling, packaging, and labor practices.

## 28. Governing law

Any and all matters in dispute between Vicor and Buyer, whether arising from or relating to a Sales Agreement or arising from alleged extra-contractual facts including, but not limited to, fraud, misrepresentation, negligence, or any other alleged tort or violation of contract, shall be governed by, construed, and enforced in accordance with the Uniform Commercial Code as enacted in the statutes of the Commonwealth of Massachusetts, without resort to the Commonwealth's conflict of laws provisions and regardless of the legal theory upon which such matter is asserted, and any applicable United States federal law. The United Nations Convention on Contracts for the International Sale of Goods does not apply to these Terms or to a Sales Agreement.

## 29. Dispute resolution; Vicor's selection of forum

Any dispute with Buyer in connection with a Sales Agreement may, at Vicor's sole discretion, be resolved through binding arbitration in the Commonwealth of Massachusetts, pursuant to the Commercial Arbitration Rules of the American Arbitration Association ("Arbitration"). The seat of the arbitration shall be Boston, Massachusetts, and the arbitration shall be conducted in the English language, with all submissions made in English or accompanied by an English translation. Witnesses may provide testimony in a language other than English if simultaneous English translation is provided. The results of Arbitration will be final and non-appealable. Buyer's only forum for dispute resolution is Arbitration. Vicor, in its sole discretion, may elect to have a judicial forum for dispute resolution. As such, Buyer irrevocably submits and agrees to the jurisdiction of the state courts of the Commonwealth of Massachusetts and the Federal courts within the Commonwealth of Massachusetts, in any action, suit, or proceeding related to, or in connection with, a Sales Agreement. To the extent permitted by applicable law, Buyer waives and agrees not to assert as a defense in any such action, suit, or proceeding any claim: (A) that Buyer is not personally subject to the jurisdiction of the state courts of the Commonwealth of Massachusetts and/or the Federal courts within the Commonwealth of Massachusetts; (B) that the venue of the action, suit, or proceeding is improper; (C) that the action, suit, or proceeding is brought in an inconvenient forum; or (D) that the subject matter of the Sales Agreement may not be enforced in or by

V.Add.12

the State and or Federal courts of the Commonwealth of Massachusetts. Without prejudice to any other mode of service, Buyer consents to service of process relating to any such proceedings by mailing in registered or certified form a copy of the process documents to the Buyer at the address set forth in the Purchase Order and confirmed in the SOA.

## 30. Compliance with laws

Buyer shall comply, and shall cause its employees to comply, with all applicable local, national, regional, and international laws, ordinances, regulations, codes, standards, directives, and international conventions and agreements to the extent that any of the foregoing have the force of law by being directly enforceable by a governmental authority, a court, or other proper tribunal (collectively "Laws"), including, but not limited to: (A) Laws associated with customs, imports, and Free Trade Agreements applicable in the jurisdiction(s) where Buyer operates or otherwise conducts business; (B) each of the aforementioned export control and economic sanctions laws identified in Section 24, as well as any other laws of similar effect in any other jurisdictions where the Buyer operates or otherwise conducts business; (C) Laws associated with the prevention of corruption and bribery, including but not limited to the U.S. Foreign Corrupt Practices Act, the U.S. Anti-Kickback Act, the United Kingdom Bribery Act, the Organization for Economic Cooperation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, and the Inter-American Convention Against Corruption, and other laws of similar effect in the jurisdictions where the Buyer operates or otherwise conducts business; (C) Laws of countries in which Buyer conducts business as they relate to the Articles of the Universal Declaration of Human Rights, employee safety and wellbeing, and corporate social responsibility; and (D) Laws associated with environmental protection and waste reduction, including, but not limited to, the EU Waste Electrical and Electronic Equipment Directive.

## 31. Notice

No notice under a Sales Agreement is sufficient to affect any rights, remedies, or obligations of either Vicor or Buyer unless the notice is in writing and (as elected by the party giving such notice) is (A) personally delivered, (B) transmitted by facsimile (with a receipt acknowledgment), (C) transmitted by electronic mail (with a receipt acknowledgment), (D) delivered by a recognized courier service, or (E) mailed by post in registered or certified form, to the party to which such notice is being given, at the respective addresses of Vicor and Buyer set forth in the Purchase Order and confirmed in the SOA. Either party may change its address by notice to the other party. All notices are deemed to have been duly given on the date of receipt if delivered personally, on the date of transmission if delivered by facsimile or electronic mail, one day after the date the notice is delivered to the courier service, or five days after postmark if delivered by postal service.

## 32. Nonwaiver

The failure of Vicor to enforce these Terms and the SOA, as amended, shall not be construed as a waiver of Vicor's right to enforce each and every provision set forth. Vicor reserves the right to enforce, at any time, these Terms and the SOA, as amended, and no provision set forth shall be deemed waived unless such waiver is evidenced by an amendment to the SOA, pursuant to Section 3. Vicor's rights and remedies set forth in a Sales Agreement are in addition to all legal and equitable rights and remedies available to Vicor.

## 33. Assignment or delegation; No third party rights

Buyer shall not assign or delegate any or all of its rights or obligations under a Sales Agreement without the prior written consent of Vicor, in letter agreement form, and any attempt to do so will be ineffective. These Terms and the SOA, as amended, are for the sole and exclusive benefit of Vicor and the Buyer and their permitted successors and assigns. Nothing expressed or referred to in a Sales Agreement will be construed to give any other person any legal or equitable right, remedy, or claim under or with respect that Sales Agreement.

## 34. Headings

The section headings contained in these Terms are used for convenience only and shall not affect in any way the meaning or interpretation of this document.

## 35. Severability

If any provision or part of a provision of these Terms or the SOA, as amended, is declared invalid, illegal, or unenforceable under applicable law, the affected provision will be modified to conform to applicable law or considered omitted. The validity, legality, and enforceability of all other remaining provisions or parts of provisions will remain in full force and effect.

## 36. Survival

The terms of the Sales Agreement that by their nature are reasonably intended by the parties to survive its expiration or earlier termination, survive the expiration or termination of the Sales Agreement.

[1] Sales of Goods in Japan by Vicor Japan Company Ltd. are governed by separate terms and conditions of sale incorporating provisions specific to Japanese law.

FM-22004 Rev. E

1/1/2018

## Get in touch with Vicor

I need help with...

Select

Select region

Select

Name

Company

Email Address

Phone Number

Your question or comment

SEND REQUEST

  

Contact Us
About the Company
Press Room
Careers
Investor Relations
Quality Center
Sales Resource Center
Accessibility Statement
Privacy and Cookie Policy
Site Map


繁體中文
简体中文
日本語

©2024 Vicor Corporation

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

In the Matter of

**CERTAIN POWER CONVERTER**                    Inv. No.  337-TA-1370
**MODULES AND COMPUTING SYSTEMS**
**CONTAINING THE SAME**

ORDER NO. 25:    **DENYING MOTION TO TERMINATE THE INVESTIGATION AS**
                 **TO CERTAIN RESPONDENTS BASED ON A FORUM SELECTION**
                 **CLAUSE REQUIRING ARBITRATION**

(January 23, 2024)

On December 28, 2023 respondents FII USA Inc. ("FII USA"), Ingrasys Technology Inc.

("Ingrasys"), and Ingrasys Technology USA Inc. ("Ingrasys USA") (together, the "Arbitration

Respondents"), as well as respondents Foxconn Industrial Internet Co. Ltd. and Hon Hai Precision

Industry Co. Ltd. (together, the "Parent Respondents"), moved (1370-010) to terminate themselves

from this investigation, and filed a memorandum in support ("Memo.").   On January 8, 2024

complainant Vicor Corporation ("Vicor") filed an opposition ("Opp'n"), and on January 16, 2024

the Commission's Office of Unfair Import Investigations filed a response opposing the motion

("Staff Resp.").   Also on January 16, 2024 the Arbitration Respondents and Parent Respondents

filed a motion (1370-014) for leave to file a reply brief, which included the proposed brief ("Reply").

The basis of the motion, in sum, is that:  the Arbitration Respondents allegedly have an

agreement with Vicor to arbitrate the subject matter of this investigation, including an alleged

license defense; the investigation should be terminated as to the Arbitration Respondents in favor

of arbitration; and the Parent Respondents should then be terminated because their only involvement

in the investigation is as the parent companies of the Arbitration Respondents.  *See* Memo. at 1.

Commission investigations may be terminated in favor of arbitration.  *See, e.g., Certain Wafer-Level*

1

████████████████████████████████

*Packaging Semiconductor Devices and Products Containing Same (Including Cellular Phones, Tablets, Laptops, and Notebooks) and Components Thereof*, Inv. No. 337-TA-1080, Order No. 26 at 7 (May 21, 2018) ("*Wafer-Level Packaging*"), *not reviewed*, Notice (Jun. 20, 2018).  But the moving party may waive an agreement to arbitrate by engaging in conduct "inconsistent with the right of arbitration."  *Certain 3G Mobile Handsets and Components*, Inv. No. 337-TA-613, Order No. 13 at 26 (Jan. 8, 2008) (citations and internal quotation omitted); *see Morgan v. Sundance*, 596 U.S. 411, 416-17 (2022) (federal appellate courts "have generally resolved cases [asserting loss of a contractual right to arbitrate] as a matter of federal law, using the terminology of waiver").

The overall litigative conduct of the Arbitration Respondents and Parent Respondents has plainly been inconsistent with the right of arbitration.  For example:

1) On December 12, 2023 all three Arbitration Respondents and both Parent Respondents, along with the other respondents, moved for summary determination that certain asserted claims are invalid for indefiniteness.  *See* EDIS Doc. ID No. 810263.

2) Also on December 12, 2023 all three Arbitration Respondents and both Parent Respondents, along with the other respondents, filed their opening claim construction brief, and thereafter filed a reply brief.  *See* EDIS Doc. ID Nos. 810261, 811225.

3)  On November 29, 2023 all three Arbitration Respondents served responses to Vicor's first set of interrogatories.  *See* Opp'n, Exs. 11, 12.  These responses were the fourth supplements by all three Arbitration Respondents.  *See id*.

4) On August 23, 2023 all parties, including all three Arbitration Respondents and both Parent Respondents, jointly proposed a target date for the investigation.  *See* EDIS Doc. ID No. 803018.

V.Add.17

██████████████████████

5) On August 18, 2023, before the target date had been set, and even before filing their responses to the Complaint, all three Arbitration Respondents and both Parent Respondents, along with the other respondents, served interrogatories on Vicor. *See* Opp'n, Ex. 10 at 1.

The Arbitrating Respondents were, moreover, on notice of their alleged right to arbitrate, and could have moved to terminate in favor of arbitration, on August 18, 2023, the date their counsel filed a notice of appearance. *See* EDIS Doc. ID No. 802693. On that date, they were aware of the allegations in Vicor's Complaint, had the ability to file the present motion through counsel, and possessed the information needed to assert arbitrability. The Arbitrating Respondents' license theory, which is what they wish to have arbitrated, is based on their purchases of the one domestic industry product Vicor identified in the Complaint, having the model designation Vicor NBM2317S60D1580T0R. *See* EDIS Doc. ID No. 800217-2025705 at 17. That license theory, in a nutshell, is: between August 2021 and May 2023, all three Arbitrating Respondents purchased Vicor NBM2317S60D1580T0R units from Vicor pursuant to purchase orders; the purchase orders all had clauses purportedly granting a license to "all intellectual property rights included in" the purchased units, as well as arbitration clauses; Vicor asserts that the purchased units embody certain claims of the patents in suit; therefore the Arbitrating Respondents possess licenses to practice the embodied claims. *See* Memo. at 2-5 (citing Motion, Exs. 1, 6, 9).

Clearly, the factual basis of this theory was at least constructively known to all three Arbitrating Respondents as soon as they were served with the Complaint. No discovery was needed to ascertain that the purchase orders supposedly created licenses to whatever patent claims the Vicor NBM2317S60D1580T0R embodies, and that any disputes over such licenses were supposedly subject to arbitration. But the Arbitrating Respondents have offered no explanation for why they

3

██████████████████████████████████████

waited months to file the present motion, and in the meantime acted as if they wish to litigate – and did, in fact, litigate.

Because there was no need for discovery to ascertain the basis of the present motion, this investigation is unlike *Wafer-Level Packaging*, on which the Arbitration Respondents and Parent Respondents rely.  *See* Memo. at 13-14; Reply at 7-9.  In that case, the respondent seeking arbitration seemingly had neither actual nor constructive notice of the arbitrability of the dispute until well into the fact discovery period.  *See Wafer-Level Packaging* at 10-11.  Here, the Arbitrating Respondents knew every fact needed both to assert licenses based on their purchase orders, and to seek arbitration based on those purchase orders, even before filing their responses to the Complaint.  But they apparently did not assert either theory until December 2023, and certainly did not do so in their responses to the Complaint.  *See* EDIS Doc. ID No. 804723 (Response of FII USA); EDIS Doc. ID No. 804724 (Response of Ingrasys and Ingrasys USA).  Nor did they discuss the purported licenses in their interrogatory responses; although licenses were discussed in the responses, the discussions omitted mention of arbitration, and that the licenses are allegedly based on agreements between themselves and Vicor, and even that the Arbitration Respondents allege express licenses ███████████ ████████████████████████████.  *See* Opp'n, Ex. 11 at 14; Opp'n, Ex. 12 at 13.  Their unexplained delay in asserting license and arbitrability, and their similarly unexplained omission of these defenses from their responses to the Complaint and to interrogatories, combined with their otherwise fulsome participation in the investigation, particularly their filing of a summary determination motion, amounts to a waiver of their right to arbitrate.  *See Khan v. Parsons Global Svcs., Ltd.*, 521 F.3d 421, 428 (D.C. Cir. 2008) (filing a summary judgment motion alone is "inconsistent with preserving the right to compel arbitration"); *see generally* Opp'n at 6 & n.5 (collecting cases).

4

V.Add.19

████████████████████████████

Some of their conduct, to be sure, is consistent with exercise of an arbitration right. All three Arbitrating Respondents filed arbitration requests with the Chinese arbitral body specified in the purchase orders. *See* Motion at 5 (citing Motion, Exs. 13, 14); Reply at 9. But these requests were only filed days before the filing of the present motion, and after the Arbitrating Respondents served discovery requests, responded to discovery requests (including four supplements), responded to the Complaint, filed opening claim construction briefs, and filed a summary determination motion, among many other litigative actions in this investigation. So even assuming that agreements to arbitrate exist, which is by no means certain, the Arbitrating Respondents have waived the right to enforce them. *See* Staff Resp. at 4-9 (arguing that no arbitration agreements exist).

On balance, therefore, the moving respondents have waived the right to arbitrate, and their motion (1370-010) is DENIED. Their motion for leave to file a reply (1370-014) is GRANTED.

Within seven days of the date of this document, the parties shall submit to the Office of the Administrative Law Judges a joint statement as to whether or not they seek to have any portion of this document deleted from the public version. If the parties do seek to have portions of this document deleted from the public version, they must submit to this office a copy of this document with red brackets indicating the portion or portions asserted to contain confidential business information. The submission may be made by email and/or hard copy by the aforementioned date and need not be filed with the Commission Secretary.

**SO ORDERED.**

 

 

Cameron Elliot
Administrative Law Judge

5

V.Add.20

**CERTAIN POWER CONVERTER MODULES AND**                    **Inv. No. 337-TA-1370**
**COMPUTING SYSTEMS CONTAINING THE SAME**

### <u>CONFIDENTIAL CERTIFICATE OF SERVICE</u>

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served via EDIS upon the Commission Investigative Attorney, **Paul Gennari**, **Esq.** and the following parties as indicated, on **January 23, 2024**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**<u>On Behalf of Complainant Vicor Corporation:</u>**

Louis S. Mastriani, Esq.                          ☐ Via Hand Delivery
**POLSINELLI PC**                                 ☐ Via Express Delivery
1401 Eye Street NW, Suite 800                     ☐ Via First Class Mail
Washington, DC 20005                              ☒ Other: Email Notification
Email: lmastriani@polsinelli.com                  of Availability for Download

**<u>On Behalf of Respondents Cyntec Co., Ltd., Delta Electronics, Inc., Delta Electronics (Americas) Ltd., Delta Electronics (USA) Inc., Quanta Computer Inc., Quanta Cloud Technology Inc., Quanta Cloud Technology USA LLC, Quanta Computer USA Inc., Hon Hai Precision Industry Co. Ltd. (d/b/a Foxconn Technology Group), Foxconn Industrial Internet Co. Ltd., FII USA Inc. (a/k/a Foxconn Industrial Internet USA Inc.), Ingrasys Technology Inc., and Ingrasys Technology USA Inc.:</u>**

Paul F. Brinkman, P.C.                            ☐ Via Hand Delivery
**KIRKLAND & ELLIS LLP**                          ☐ Via Express Delivery
1300 Pennsylvania Avenue, NW                      ☐ Via First Class Mail
Washington, DC 20004                              ☒ Other: Email Notification
Email: paul.brinkman@kirkland.com                 of Availability for Download

Massachusetts General Laws Annotated

Part III. Courts, Judicial Officers and Proceedings in Civil Cases (Ch. 211-262)

Title IV. Certain Writs and Proceedings in Special Cases (Ch. 246-258e)

Chapter 251. Uniform Arbitration Act for Commercial Disputes (Refs & Annos)

M.G.L.A. 251 § 2

## § 2. Refusal to arbitrate; application to superior court

Currentness

(a) A party aggrieved by the failure or refusal of another to proceed to arbitration under an agreement described in section one may apply to the superior court for an order directing the parties to proceed to arbitration. If the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall, if it finds for the applicant, order arbitration; otherwise, the application shall be denied.

(b) Upon application, the superior court may stay an arbitration proceeding commenced or threatened if it finds that there is no agreement to arbitrate. Such an issue, when in substantial and bona fide dispute, shall be forthwith and summarily determined, and if the court finds for the applicant it shall order a stay of arbitration; otherwise the court shall order the parties to proceed to arbitration.

(c) If an issue referable to arbitration under the alleged agreement is involved in an action or proceeding pending in a court having jurisdiction to hear applications under paragraph (a), the application shall be made therein, otherwise and subject to section seventeen, the application may be made in any court of competent jurisdiction.

(d) Any action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this section or, if the issue is severable, the stay may be with respect to such issue only. When the application is made in such action or proceeding, the order for arbitration shall include such stay.

(e) An order for arbitration shall not be refused on the ground that the claim in issue lacks merit or bona fides or because any fault or grounds for the claim sought to be arbitrated have not been shown.

**Credits**

Added by St.1960, c. 374, § 1.

Notes of Decisions (52)

V.Add.22

**§ 2. Refusal to arbitrate; application to superior court, MA ST 251 § 2**

M.G.L.A. 251 § 2, MA ST 251 § 2
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.